Argued and submitted January 29, 1988, affirmed February 22, 1989

## STATE OF OREGON,
*Appellant,*

*v.*

## SCOTT L. WICKEY,
*Respondent.*

(87-03-31515; CA A45134)

769 P2d 208

Jonathan H. Fussner, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were

were Dave Frohnmayer, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for respondent. With him on the brief was Gary D. Babcock, Public Defender, Salem.

Before Richardson, Presiding Judge, and Newman and Deits, Judges.

RICHARDSON, P. J.

Deits, J., concurring.

## RICHARDSON, P. J.

The state appeals a pretrial order suppressing statements that defendant made to police detectives. The trial court concluded that the statements were elicited after defendant had invoked his right to counsel. The state argues that defendant's request for an attorney was equivocal and that, therefore, the detectives could make additional inquiries to clear up the ambiguous request and that, while in the process of clearing up the ambiguity, defendant voluntarily waived his right to counsel. We affirm.

This case arises from the murder of Eddie Lee Gibbs. Defendant and Kevin Roper were charged with aggravated murder, robbery and kidnapping as a result of the homicide. Defendant first became involved in the investigation when he reported that he had discovered the body. Investigating detectives had several conversations with him after the homicide was reported, and one detective described defendant then as only a "peripheral suspect." On the tenth day after the homicide was discovered, defendant voluntarily accompanied the detective to the police station and agreed to take a polygraph examination. Before the test, the polygraph operator informed him of his constitutional rights, and he signed a form acknowledging that he understood them. He also signed a form agreeing to take the examination, which began shortly after 9 a.m.

After completing the examination, the examiner took defendant to the investigating detectives and told them whether, in his opinion, defendant was telling the truth about the homicide.[1] The detectives began interviewing defendant at approximately 11:30 a.m. After initially denying involvement, defendant admitted his participation and implicated Roper. During that time, defendant expressed remorse, at times cried and talked of being upset and losing sleep since the murder. Detective Jensen, who conducted the interview, described what occurred at the end of the hour long sessions:

"A    Obviously to this point, it was just him expressing maybe some concern about his mental stability. He had not mentioned up to this point, and did not mention at this instance, a request to have legal counsel present.

---

[1] The court sustained defendant's objection to the examiner's testimony about the results of the test.

"Q [Prosecutor:] Did [defendant] ever use the word 'lawyer' at that point?

"A Not at that point.

"Q Okay. Did he ever?

"A Yes.

"Q When was that?

"A Several minutes [after the admission]—again, as the interview was pretty much coming to a conclusion, he again said something to the effect—and I won't put quotation marks around this, but words to the effect of, I think I need to talk to somebody, or, I think I should talk to somebody.

"So we said, 'You mean a doctor? Do you mean a doctor?' 'cause we had just discussed that a few minutes before. And he goes, 'Maybe a doctor. Maybe a lawyer. I don't know'—words to that effect.

"Q And what did you do after that?

"A After that, we—as we had had his story, we took him back to his interview—I mean, not an interview room, but a holding cell * * *."[2]

The detectives immediately stopped interviewing defendant and took him to a holding cell at approximately 12:30 p.m. Sometime between then and 5:19 p.m., he was discovered unconscious after an attempt to strangle himself with his shoe laces. Paramedics treated him in his cell, and no further medical attention was necessary. His attempted suicide did not cause any further medical difficulty or affect his ability to speak.

At 5:19 p.m., the detectives who had interviewed defendant at 11:30 a.m. took him to an interview room and began a second, tape-recorded interview. At the beginning of that session, he was again informed of his constitutional rights and again signed a form acknowledging that he understood them. The detectives then asked:

"Q. Previously when we spoke with you, did you say that you wanted a doctor?

---

[2] Although defendant gave a different account, the trial court adopted the testimony of Detective Jensen. We must accept the court's factual finding, because there is evidence to support it. *State v. Kahut,* 71 Or App 243, 247, 692 P2d 138 (1984), *rev den* 299 Or 31 (1985). Thus, we do not set out defendant's account of what occurred.

"A.  Yeah, I think there's gotta be something wrong with me. For what I've done.

"Q.  Did you ever say that you wanted an attorney?

"A.  *I think it would be a good idea to talk to one.*

"Q.  Okay. Do you want an attorney at this time?

"A.  No." (Emphasis supplied.)

The detectives began questioning defendant about the homicide, and he gave them a detailed statement, which was tape recorded.

In the motion to suppress, defendant argued that he had requested counsel before the polygraph test was administered and sought suppression of all of his statements on the ground that his rights under the federal and state constitutions were violated. The trial court concluded:

"I'm satisfied with the noncustodial investigatory posture of the State's case up to the invocation of counsel event at the end of the nontaped 11:30 a.m. interview that took place when [defendant], at about 12:30, after oral admissions, indicated that he wished to talk to a doctor and maybe a lawyer.

"This was a sufficient assertion of his desire for counsel; and anything after this point, including the taped interview at 17:19 on March the 16th—this latter taped interview having been a contact initiated by the police and not by the defendant, instigated by the police after invocation of his rights to counsel—is suppressed."

The state argues that defendant's statement about an attorney near the end of the 11:30 a.m. interview was ambiguous and that the detectives were entitled to initiate another interview at 5:19 p.m. to clear up the ambiguity. At that interview, the state contends, defendant said he did not want counsel at that time and, consequently, the tape-recorded statement was not unlawful under either constitution.

Under the Fifth Amendment, once a defendant invokes a right to counsel, the police must cease questioning until counsel is provided or the defendant initiates further conversation and waives the previously asserted desire for counsel. *Edwards v. Arizona,* 451 US 477, 484, 101 S Ct 1880, 68 L Ed 2d 378 (1981). Recently, the Oregon Supreme Court made a similar interpretation of Article I, section 12, of the Oregon Constitution: "Upon request for counsel, questioning

not only 'should' but must cease." *State v. Isom,* 306 Or 587, 593, 761 P2d 524 (1988); *see also State v. Kell,* 303 Or 89, 95-96, 734 P2d 334 (1987). Consequently, statements obtained as a result of further interrogation may not be used as direct evidence or for impeachment. *State v. Isom, supra,* 306 Or at 592-95.

■ The question in this case is whether defendant invoked his right to counsel. An adequate invocation is "any plain reference, however glancing, to a need or desire for representation." *Connecticut v. Barrett,* 479 US 523, 534, 107 S Ct 828, 93 L Ed 2d 920 (1987) (Brennan, J., concurring); *see also Miranda v. Arizona,* 384 US 436, 444-45, 86 S Ct 1602, 16 L Ed 2d 694 (1966). The putative request for counsel must be analyzed in the light of the circumstances existing when it was made. A statement that may appear tenuous or equivocal in isolation may be a sufficient request for counsel when evaluated in the context of all of the circumstances. *Smith v. Illinois,* 469 US 91, 99-100, 105 S Ct 490, 83 L Ed 2d 488 (1984).

■ Even if we accept the state's contention that defendant's request at the end of the 11:30 a.m. interview was equivocal, the detectives' attempts at 5:19 p.m. to clarify the request again resulted in an adequate invocation of defendant's right to be represented by counsel. After the 11:30 a.m. interview, the detectives ceased questioning, because they did not want any further information from defendant but wanted to question Roper. They did not, at that time, attempt to clarify defendant's request.

At 5:19 p.m. the detectives readvised defendant of his constitutional rights. They then asked: "Did you ever say that you wanted an attorney?" Defendant responded: "I think it would be a good idea to talk to one." The attempt to clear up what the detectives apparently considered to be an equivocal response earlier in the day resulted in a response which, under the circumstances, adequately informed them that defendant wanted to talk to an attorney. The admonition of *State v. Isom, supra,* is that questioning must cease. Consequently, the detectives' additional question as to whether defendant wanted "an attorney at this time" was prohibited. The tape-recorded statements that followed were properly suppressed.

The state argues alternatively that, if defendant

invoked his right to counsel at the end of the 11:30 a.m. interview, the invocation was not made during a custodial interrogation. Accordingly, it argues, the detectives were not required to end their questioning. Because we conclude that defendant adequately invoked his right to counsel in the 5:19 p.m. interview, which the state agrees was a custodial interrogation, the contention need not be addressed.

Affirmed.

**DEITS, J.**, concurring.

I agree that defendant effectively invoked his right to counsel when he responded to the detective's clarification question with "I think it would be a good idea to talk to [an attorney]." However, I do not believe that the follow-up question was impermissible, as the majority implies, *on the sole basis* that it was a question. In my view, neither *State v. Isom,* 306 Or 587, 761 P2d 524 (1988), nor *State v. Kell,* 303 Or 89, 734 P2d 334 (1987), goes that far. Rather, those cases stand for the proposition that, when a defendant has invoked the right to counsel, *interrogation* by the police must cease. Of course, not every question constitutes interrogation. As I understand the concept, interrogation encompasses only those questions or comments designed or objectively likely to elicit an admission or waiver of a defendant's right to counsel.[1] In this case, defendant invoked his right to counsel, and the police followed up by asking, "Do you want an attorney at this time?" Although it is a close matter, I believe that that question constitutes interrogation under the circumstances of this case.

---

[1] For example, in *State v. Barmon,* 67 Or App 369, 376, 679 P2d 888, *rev den* 297 Or 227 (1984), we said that "interrogation" in the context of a defendant's waiver of *Miranda* rights consists of

"words or actions on the part of police, other than those normally attendant on arrest and custody, that the police should know are reasonably likely to solicit an incriminating response from the suspect."

We also quoted from *Oregon v. Bradshaw,* 462 US 1039, 103 S Ct 2830, 77 L Ed 2d 405 (1983), in which the United States Supreme Court stated:

"There are some inquiries, such as a request for a drink of water or a request to use a telephone that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation. Such inquiries or statements, by either an accused *or a police officer,* relating to routine incidents of the custodial relationship, will not generally 'initiate' a conversation in the sense in which that word was used in *Edwards.*" 462 US at 1045. (Emphasis supplied.)

For that reason, I agree with the majority that the waiver that followed was invalid.