Submitted on record and briefs September 29, 2006, convictions on Counts 5, 19, and 20 reversed; sentences vacated; remanded for resentencing; otherwise affirmed May 30, petition for review denied October 4, 2007 (343 Or 224)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## MARC MEALEY HOLCOMB,
*Defendant-Appellant.*

Linn County Circuit Court
99122871; A116966

159 P3d 1271

Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, and Eric Johansen, Senior Deputy Public Defender, Office of Public Defense Services, filed the briefs for appellant. Marc Mealey Holcomb filed the supplemental brief *pro se*.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Kaye E. McDonald, Assistant Attorney General, filed the brief for respondent.

Before Edmonds, Presiding Judge, and Armstrong and Wollheim, Judges.

WOLLHEIM, J.

## WOLLHEIM, J.

Defendant appeals a judgment of conviction for murder, ORS 163.115, two counts of attempted murder with a firearm, ORS 163.115, two counts of unlawful use of a weapon, ORS 166.220, attempted aggravated murder, ORS 163.095, two counts of burglary in the first degree with a firearm, ORS 164.225, and burglary in the first degree, ORS 164.225. We agree with defendant that the trial court erred in denying his motion to suppress some of his statements to police during a custodial interrogation. However, we conclude that the error was harmless as to some of his convictions. Accordingly, we affirm in part and reverse in part; vacate defendant's sentences, and remand for resentencing.

We state the facts in the light most favorable to the state because defendant was convicted by a jury. *State v. Charboneau*, 323 Or 38, 40-41, 913 P2d 308 (1996).

In November 1999, defendant and two other men went to the home of Dean and John Pruitt, defendant's acquaintances. The Pruitts resided with their mother, Belanger, in Sweet Home, Oregon. Once inside, defendant pulled a gun from his pants and demanded money. Defendant threatened that, if he did not get the money, he would "blow [Belanger's] head right off the top of her shoulders." Dean Pruitt struggled with defendant, attempting to steer the gun away from Belanger. During the struggle, defendant shot and killed Dean Pruitt. John Pruitt attempted to come to his brother's aid, but defendant shot and seriously wounded him.

Defendant fled and shortly thereafter arrived in Lebanon, Oregon. There, defendant committed numerous crimes by breaking into several residences and threatening the occupants. Defendant's conduct in Lebanon included, among other things, firing shots through the door of the Kauffman residence. There, Ben Kauffman, who was at home with his younger brother, Micah Kauffman, opened the door and saw defendant pull a gun out of his waistband. Kauffman slammed the door shut and defendant immediately fired two shots through the door. Defendant also entered the Newell residence. Matt Newell, who was inside

with his younger brother and his neighbor Micah Kauffman,[1] shot defendant in the chest. Next, defendant went to the Rabine residence and pounded on the front door while Sandra Rabine was alone inside. Rabine ran to get her gun and then heard defendant at her back door. Defendant broke a small glass window in the back door, stuck his hand through the broken window, and was trying to unlock Rabine's door.[2] Ultimately, defendant took several items from the homes, including a van that he used to flee.

Approximately three weeks later, defendant was arrested for the Pruitt shootings and subsequent home invasions. The officers identified defendant by the gunshot wound on his chest, which they found to be "in a healing condition." Defendant did not request medical attention at that time. The officers transported defendant to the sheriff's office, where Officers David and Culley interviewed defendant for approximately one hour. The entire interview was videotaped. Defendant walked with a limp into the interview room but, again, did not request medical attention. Prior to interviewing him, the officers read defendant his *Miranda* rights, and defendant orally acknowledged that he understood his rights. Defendant made several incriminating statements during the interview, describing his involvement in the crimes. The particulars of those statements are more fully described below. 213 Or App at 174-75, 179-80, 181. After the interview concluded, the officers drove defendant to a hospital where a physician examined him and prescribed Advil for his pain. Defendant was later booked into the Linn County Jail.

Defendant was charged in a 29-count indictment. He pleaded guilty to 18 of the counts.[3] Prior to trial on the

---

[1] Initially, Micah Kauffman was inside his own house. However, when defendant burst into the Kauffman residence, Ben Kauffman yelled for his brother, Micah, to get out of the house. Micah ran to the Newell residence for help. Micah and Matt Newell's younger brother, C. J., were hiding in a closet in the Newell residence when defendant entered that home.

[2] Defendant entered additional residences in Lebanon, but we do not discuss the facts relating to those residences because they are not relevant to the issues raised on appeal.

[3] Defendant's convictions on those counts are not at issue on appeal.

remaining counts, defendant moved to suppress his video-taped statements to police on the grounds that the statements were obtained in violation of his right against compelled self-incrimination under the Oregon Constitution and the United States Constitution, and that the statements were involuntary. The trial court denied defendant's motion to suppress, and the state played the entire videotaped interview to the jury. The jury acquitted defendant of three of the counts and found him guilty on the remaining eight counts.[4]

On appeal, defendant contends that the trial court erred in denying his motion to suppress. He renews his argument that the statements were taken in violation of his rights against compelled self-incrimination and were involuntary. The state contends that the trial court's ruling was correct because defendant made an equivocal invocation of his right to remain silent, but then waived that right by initiating further conversation with the officers. In addition, the state argues that defendant did not unequivocally invoke his right to counsel; instead, defendant selectively invoked the right to counsel with respect to certain aspects of the investigation and waived the right with regard to other aspects. Lastly, the state contends that defendant's statements were voluntary.

The right to be free from compelled self-incrimination is guaranteed by Article I, section 12, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution.[5] Both provisions prohibit the state from compelling a defendant to testify against himself or herself. As the Supreme Court recognized in *State v. Sparklin*, 296 Or 85, 89, 672 P2d 1182 (1983), police interrogation of a suspect

---

[4] On appeal, defendant challenges nine of his convictions: the eight counts on which the jury returned a verdict of guilty, and Count 12, burglary in the first degree with a firearm, ORS 164.225. We affirm defendant's conviction on Count 12 because he pleaded guilty to that count. It appears that defendant relied on the trial court's judgment in challenging his conviction on Count 12. The judgment incorrectly recites that the jury reached a "verdict of guilty" on Count 12, when, in fact, the record shows that defendant pleaded guilty to Count 12. Defendant's guilty plea on Count 12 precludes the claims of error he raises on appeal as to that count. Accordingly, we affirm his conviction on Count 12 without further discussion.

[5] Article I, section 12, provides that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." The Fifth Amendment provides that "[n]o person shall be * * * compelled in any criminal case to be a witness against himself."

who is in custody is inherently coercive. Accordingly, the right against compelled self-incrimination includes a derivative right to the assistance of counsel during custodial interrogation, because a "lawyer's presence at a custodial interrogation is one way to ensure the right to be free from compelled self-incrimination." *State v. Meade*, 327 Or 335, 339, 963 P2d 656 (1998). For that reason,

> "we require the police to inform a detained person that he may terminate questioning at any time and that he may have an attorney to advise him before he speaks. When the police honor th[ose] rights if [a] defendant chooses to assert them, the coercive atmosphere of police interrogation is to some degree dispelled."

*Sparklin*, 296 Or at 89.

We start by examining defendant's claim of error under Article I, section 12, of the Oregon Constitution. *See State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983) (courts decide state constitutional issues before federal constitutional issues). Defendant contends that the officers violated his Article I, section 12, right against compelled self-incrimination by continuing to interrogate him after he invoked his right to remain silent and his right to have counsel present at the interrogation.

The admissibility of a defendant's statements during custodial interrogation is an issue of law. *State v. James*, 339 Or 476, 481, 123 P3d 251 (2005). We review the trial court's legal conclusion regarding whether a defendant invoked his Article I, section 12, right for legal error. *State v. Terry*, 333 Or 163, 172, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002). The question of what transpired during a custodial interrogation is a question of fact for the trial court, and we are bound by the trial court's findings of fact if they are supported by evidence in the record, although "we assess anew whether th[ose] facts suffice to meet constitutional standards." *James*, 339 Or at 481.

We briefly discuss the principles that govern our analysis. When a suspect in police custody unequivocally invokes the right to remain silent or the right to counsel, all police interrogation must cease. *Meade*, 327 Or at 339; *State v. Gable*, 127 Or App 320, 329, 873 P2d 351, *rev den*, 319 Or

274 (1994). The opportunity to resume interrogating the suspect varies depending on which right the suspect unequivocally invokes. If the suspect unequivocally invokes the right to remain silent, the police may resume interrogating the suspect after a reasonable period of time has elapsed, provided that the police renew the *Miranda* warnings, and the suspect validly waives the right to remain silent. *State v. Rowe*, 79 Or App 801, 805-06, 720 P2d 765, *rev den*, 302 Or 86 (1986). If the suspect unequivocally invokes the right to counsel, the police must cease all interrogation until an attorney is provided. *State ex rel Juv. Dept. v. Thai/Schmolling*, 138 Or App 354, 358, 908 P2d 844 (1995). However, a suspect can validly waive the right against compelled self-incrimination as long as the waiver is knowing and voluntary under the totality of the circumstances. *Meade*, 327 Or at 341.

When a suspect's invocation is equivocal, the police are permitted to ask follow-up questions to clarify whether the suspect, through the equivocal request, intended to invoke either right. *Charboneau*, 323 Or at 54; *State v. Montez*, 309 Or 564, 572, 789 P2d 1352 (1990). An officer's duty to clarify a suspect's equivocal invocation may be obviated if the suspect initiates further substantive conversation concerning the investigation before the officer has clarified the suspect's intent. *Meade*, 327 Or at 340. Thus, after an equivocal invocation, a suspect can waive his rights by reinitiating substantive conversation with the officers in a manner that evidences "a willingness and a desire for a generalized discussion about the investigation." *Id.* at 341.

Moreover, a suspect can *partially* waive the right against compelled self-incrimination by voluntarily discussing certain aspects of an investigation, but at the same time *selectively* invoke the right by refusing to discuss other aspects of the investigation without the assistance of counsel. *State v. Kell*, 303 Or 89, 94, 734 P2d 334 (1987). In *Kell*, the police officers interviewed the defendant in regard to a car bombing. *Id.* at 91. During the interview, an officer told the defendant that "[o]ther people have told us you were the primary instigator." *Id.* at 92. The defendant responded:

"DEFENDANT: That's a raft of bullshit! It was my idea, huh! Well I'm not going to go any further with this until I speak with a lawyer.

[Defendant still talking]

"POLICE: Well let me tell you this though * * *

[Defendant still talking]

"DEFENDANT: No, I mean I'll talk to you about it, but as far as *this, my idea,* I want to talk to a lawyer because this is a bunch of bullshit!

"POLICE: Do you want to talk to us?

"DEFENDANT: Well, yeah, doesn't matter to me."

*Id.* (emphasis in *Kell*). The defendant went on to make several incriminating statements. The court concluded that the defendant's right against compelled self-incrimination was not violated in that exchange, because the defendant,

"after being fully warned and voluntarily waiving his rights against self-incrimination, chose to speak to the police officers about every aspect of the case except as to whose idea it was to dynamite the car. Defendant was entitled to pick and choose what he wished to talk about."

*Id.* at 99.

With those principles in mind, we turn to defendant's contention that the officers violated his Article I, section 12, and Fifth Amendment rights against compelled self-incrimination.

### RIGHT TO REMAIN SILENT

We start with the exchange in which defendant contends he invoked his right to remain silent. Immediately after the officers advised defendant of his *Miranda* rights and defendant acknowledged that he understood those rights, the following conversation ensued:

"[Culley]: You wanna talk at me? Let me know what's goin[g] on, guy.

"[Defendant]: *Just tell you that I'm gonna do the right thing. I don't wanta uh make any statements right now.*

"[Culley]: Okay. Do you wanna talk to me later or—What you wanna do guy? I'll do what I can to help you out and work with ya. Can't make any promises."

(Emphasis added.) At that point, David, the other officer, started to say something, and defendant cut him off and stated, "I'm gonna do life in prison." Defendant continued to ask the officers questions related to that statement, such as which jail he would be housed at and the possibility of federal charges for his acts. David responded to those questions and statements. Defendant then asked about Dean and John Pruitt. The officers told defendant that they interviewed John Pruitt, and David started to explain to defendant that "we have his side of the story. Now whether he's being completely honest," when defendant interrupted and said, "[Dean Pruitt] tried to attac[k] me in the fuck'ng house, man." Defendant proceeded to make additional statements regarding the incident.

Based on that exchange, the trial court concluded that defendant's request to remain silent, "I'm gonna do the right thing. I don't wanta uh make any statements right now," was equivocal. It reasoned that the request "le[ft] open the question of when he might want to make statements." Further, the court found that, immediately after defendant's equivocal request, Culley then asked "a question clarifying the equivocal nature of [his] statement * * * and defendant elect[ed] * * * to continue talking."

■ To determine whether defendant unequivocally or equivocally invoked his right against compelled self-incrimination, we analyze the request in light of the totality of the circumstances at the time it was made. *State v. Wickey*, 95 Or App 225, 230, 769 P2d 208 (1989). That determination requires that we assess the circumstances that preceded the request, and not the events subsequent to it, to ascertain whether a reasonable officer in the circumstances would have understood that defendant was invoking his rights. *Davis v. United States*, 512 US 452, 458-59, 114 S Ct 2350, 129 L Ed 2d 362 (1994); *State v. Dahlen*, 209 Or App 110, 117, 146 P3d 359, *modified on recons*, 210 Or App 362, 149 P3d 1234 (2006). On appeal, defendant argues that his statement, "I'm gonna do the right thing. I don't wanta uh make any statements right now," was an unequivocal invocation of his right to remain silent. The state contends that defendant's statement was equivocal. To support its contention, the state

relies on defendant's demeanor during the interview, the conflicting elements of his statement, and his extensive criminal history that included prior unrelated incidents with the police in which defendant successfully invoked his right to remain silent.[6]

Defendant's request, "I'm gonna do the right thing. I don't wanta uh make any statements right now," is equivocal. It is not apparent what defendant meant by "I'm gonna do the right thing." That statement could reasonably mean that he was going to cooperate with the police and make a statement, just not at the moment. Or it could reasonably mean that he wanted to do the right thing by not making any statements. The statement was ambiguous. Also, defendant limited his request by indicating that he did not want to make any statements *"right now."* (Emphasis added.) We agree with the trial court that defendant's request left open a question of when he would make a statement. *See Charboneau*, 323 Or at 55 (concluding that the defendant's request, "Will I have an opportunity to call an attorney tonight?" was equivocal). Based on the totality of the circumstances, a reasonable officer in that situation would not have understood defendant's statement to be an unequivocal invocation of his right to remain silent.

---

[6] The state relies on *State v. Gable*, 127 Or App 320, 332, 873 P2d 351, *rev den*, 319 Or 274 (1994), for the proposition that "[i]t is proper for a court to consider the 'defendant's past experience and conduct with the police in determining whether he unequivocally' invoked his rights." In *Gable*, the court concluded that, if the defendant in that case had wanted the assistance of counsel, he would have unequivocally requested it, as he successfully had done in a prior interview regarding the same matter. We do not read *Gable* as broadly as the state posits, to always allow a court to consider evidence of prior successful invocations in determining whether an invocation is equivocal or unequivocal. In some situations, such as here, evidence of *prior* successful unequivocal invocations in *unrelated* investigations with *different* police officers are of nominal significance to ascertaining whether a reasonable officer in the circumstances at issue would have understood that the suspect was invoking his rights. Here, the state presented evidence at the suppression hearing that on two previous occasions defendant unequivocally and successfully invoked his right to remain silent on two unrelated matters with two different officers, not David or Culley. Based on that evidence, the state argues on appeal that "defendant had enough experience to know that he could stop talking to the police at any time he chose." However, those prior unrelated invocations do not lend any support to determining whether a reasonable officer in Culley's position would have understood defendant's statement as an invocation of his rights.

Accordingly, the officers were permitted to ask defendant questions to clarify whether he intended to invoke his right to silence. *See Charboneau,* 323 Or at 54; *Montez,* 309 Or at 572. That is exactly what Culley did when he asked defendant, "Do you wanna talk to me later or—What you wanna do guy?" Culley's question was appropriate and did not violate defendant's rights pursuant to Article I, section 12.

■ Defendant did not respond to Culley's question; instead, he reinitiated conversation with the officers without clarifying his equivocal invocation. Defendant's voluntary statements to the officers about the consequences that he possibly faced for his actions, his question about the Pruitts, and his statement that Dean Pruitt attacked him all evidence defendant's willingness and desire for a generalized discussion of the substance of the investigation. Under the totality of the circumstances, defendant validly waived his right to remain silent by voluntarily reinitiating conversation with the police. The trial court did not err in denying defendant's motion to suppress on that ground.

Additionally, because defendant's request to remain silent was equivocal, the officers did not violate his rights under the Fifth Amendment to the United States Constitution. Under the Fifth Amendment, if a suspect's statement is ambiguous or equivocal, the officers have no obligation to stop questioning him. *Davis,* 512 US at 461-62 (holding that an objectively ambiguous or equivocal invocation of Fifth Amendment rights does not require the immediate cessation of interrogation). Also, the Fifth Amendment does not impose a duty on officers to ask questions to clarify whether a suspect intended to invoke his rights. *See id.* at 461 (declining to adopt a rule requiring officers to ask clarifying questions in response to a suspect's equivocal invocation).

### RIGHT TO COUNSEL

■ We turn to defendant's assertion that the officers violated his Article I, section 12, and Fifth Amendment rights against compelled self-incrimination by continuing to question him after he unequivocally invoked his right to counsel. Defendant asserts that he unequivocally invoked his right to counsel on four separate occasions during the interview. The

state counters that defendant did not invoke his right to have counsel present at the interview; instead, he selectively invoked his right to counsel with regard to certain aspects of the investigation, but waived his right with regard to other aspects.

The first instance in which defendant contends that he invoked his right to counsel occurred while he was describing the incident involving the Pruitts to the officers. The following exchange occurred:

"[Defendant]:   Fuck'n Dean came at me.

"[David]:   Okay.

"[Defendant]:   And uh

"[David]:   Did you have the gun at that time?

"[Defendant]:   *I don't even fuck'ng know, man. I have an attorney an[d] shit. I wanna tell you guys the truth and I don't wanna fuck'n lie. You know what I'm say'n.*

"[David]:   I hear ya, Marc.

"[Defendant]:   But I just don't wanna fuck'ng end up fuck'ng making things worse, worse for me and I don't wanna fuck'n snitch either because, uh I fuck'n got that to deal with, too. You know what I'm sayin.

"[David]:   I know what you're sayin.

"[Defendant]:   That's fuck'n the heaviest of all the snitch'n and stuff. You know what I'm say'n."

(Emphasis added.) Defendant then explained to the officers that he was labeled a "snitch" during a previous prison sentence and that he wanted to avoid that situation again. David responded:

"[David]:   At this point, we're not asking you * * * to give anybody up or snitch * * * and be labeled a snitch again. Obviously you were last time but I don't [know] how that's gonna * * * work, but you gotta * * * think about yourself here. And I'm tellin you that the stuff that the people are tellin us right now, there's gotta be another side to this story.

"[Defendant]:   There is, man I didn't go there to try to do nothin to nobody. We went down there to try to get high on some dope[ ] * * *."

Defendant went on to make incriminating statements regarding his involvement in the crimes.

Our first consideration is whether, based on that exchange, defendant made an unequivocal request for counsel. Again, we make that determination by analyzing the request in light of the totality of the circumstances to determine whether "a reasonable officer in the circumstances would have understood that the suspect was invoking the right to counsel." *Dahlen*, 209 Or App at 117.

We start by noting that defendant's statement, "I have an attorney an[d] shit," was, at best, an equivocal invocation of the right to counsel. He merely stated that he had an attorney; he did not say that he wanted to terminate the interview or refuse to answer questions without his attorney being present. Based on the totality of the circumstances, a reasonable officer would not have understood that defendant was invoking his right to counsel.

■        Even if defendant's statement constituted an equivocal request for counsel, the officer's duty to ask clarifying questions was obviated by defendant's subsequent unprompted statements. *See Meade*, 327 Or at 340. After defendant mentioned counsel, he explained to the officers that he would not answer David's question about the gun, because he did not want to be labeled a "snitch" in prison. The trial court's findings of fact on that issue are particularly relevant; it found that "[defendant's] greatest concern was to avoid 'snitching' on anyone and he repeatedly refused to disclose information that he considered to be snitching."

We agree with the trial court that defendant selectively invoked his right to counsel with respect to aspects of the investigation that implicated the criminal conduct of third parties—specifically, aspects of the investigation that required defendant to "snitch" on a third party. However, defendant made a knowing and voluntary *partial* waiver of his right to counsel by continuing to make unprompted incriminating statements regarding his own involvement in

the crimes. *See Kell*, 303 Or at 99. The officers did not violate his rights under Article I, section 12, in that respect.

In addition, that exchange did not violate defendant's rights under the Fifth Amendment because his statement was, at best, an equivocal invocation of his right to counsel and, therefore, the officers had no obligation to stop questioning him. *See Davis*, 512 US at 461.

■ The second instance in which defendant contends that he invoked his right to counsel occurred while he was describing the home invasions. The following conversation occurred:

"[David]: Are you able to tell us where you got the gun from?

"[Defendant]: Um, not now.

"[David]: Okay. That's cool. That's cool. That's cool. All right[.]

"[Defendant]: *I promise you, I'll make a promise with you guys if you promise me, when I get my attorney, I'll ask all these—I'll answer your guys's questions. Literally, 'Cause I want, you know what I'm sayin—I'm—I know I'm gonna do \* \* \* 25 to life or something like that.*

"[Culley]: Who [is] your attorney, Marc[?]

"[Defendant]: My dad's got one. I don't even know who he is.

"[Culley]: Okay.

"[Defendant]: It's like, you know, I don't even trust my fuck'n dad. You know what I'm sayin.

"[Culley]: He's worried about ya 'cause I talked to him last weekend \* \* \*. He's worried that you're gonna get shot again or somethin[.]

"[David]: [U]m, [o]kay. So you're shot and then do you leave that house or what's the story there.

"[Defendant]: I's shot and left the house alone and tried to talk \* \* \* the lady into let[ting] me have her car to go away. She told me she had a gun."

(Emphasis added.) Defendant continued to make incriminating statements regarding his conduct in the home invasions.

Defendant's statement, "when I get my attorney * * * I'll answer your * * * questions," was unequivocal. He directly indicated that he would answer *all* of the officers' questions, not a specific question, when his attorney was present. That statement leaves no doubt that defendant intended to invoke his right to counsel. Accordingly, all interrogation should have ceased. *See Meade*, 327 Or at 339. However, David continued to interrogate defendant by asking, "So you're shot and then do you leave that house or what's the story there[?]" Defendant did not reinitiate substantive conversation with the officers; the only statements that he made between his unequivocal invocation and David's substantive question were in his brief conversation with Culley regarding his father. David's question violated defendant's Article I, section 12, right against compelled self-incrimination. Accordingly, all statements made by defendant after that violation should have been suppressed.[7]

As an alternative ground for his argument that the trial court erred in denying his motion to suppress, defendant contends that his statements were involuntary; that contention is not well taken. On appeal, he argues that the officers implicitly promised him leniency in exchange for his statements and that, when he made the statements, he needed medical treatment for a gunshot wound and a broken ankle. The trial court concluded that defendant's statements were voluntary, and its findings, by which we are bound, *State v. Acremant*, 338 Or 302, 324, 108 P3d 1139, *cert den*, 546 US 864 (2005), support that legal conclusion. We agree with the trial court that defendant's statements were voluntary. Accordingly, all the statements that defendant made prior to the constitutional violation are admissible.

Having concluded that the trial court erred in admitting defendant's statements after the constitutional violation, we must now determine whether that error requires reversal of defendant's convictions.[8] Article VII (Amended), section 3, provides, in part:

---

[7] We would reach the same result even if we had concluded that defendant's request was equivocal, because David continued interrogating defendant without clarifying his intent and without defendant indicating that he was willing to enter into a generalized discussion regarding the substance of the charges without the assistance of counsel.

[8] Neither party made any argument regarding whether any error was harmless.

"If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial[.]"

The test for determining whether an error is harmless under Article VII (Amended), section 3, is whether there is "little likelihood that the error affected the jury's verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). The focus of that inquiry is on the "possible influence of the error on the verdict rendered[.]" *Id*. The Supreme Court explained our inquiry under the harmless error test:

"In determining whether the error affected the verdict, it is necessary that we review the record. However, in so doing, we do not determine, as a factfinder, whether the defendant is guilty. That inquiry would invite this court to engage improperly in weighing the evidence and, essentially, retrying the case, while disregarding the error committed at trial, to determine whether the defendant is guilty. Rather, when we review the record, we do so in light of the error at issue. We ask whether there was little likelihood that the error affected the jury's verdict. * * * [It] is not a finding about how the court views the weight of the evidence of the defendant's guilt. It is a legal conclusion about the likely effect of the error on the verdict."

*Id*.

We consider separately each of the counts on which the jury returned a verdict of guilty to determine whether the erroneously admitted portions of defendant's interview had little, if any, likelihood of affecting the verdict on each particular count.

We start with Count 2, under which the jury convicted defendant of murdering Dean Pruitt. ORS 163.115. During the interview, defendant made statements, both before and after the constitutional violation, that relate to Count 2. Prior to the violation, defendant explained that "[Dean] tried to attac[k] me in the fuck'ng house, man," and that defendant "didn't try to kill anybody[.]" Those statements were properly admitted. Subsequent to the constitutional violation, defendant described the incident in somewhat greater detail; he explained that he "wrestled [with Dean] over the gun and fuck'n a shot got fired" and that he

"figured [that] Dean was probably gonna die because [the gun] was so close."

Based on our review of the record in its entirety, we conclude that there is "little likelihood" that defendant's erroneously admitted statement "affected the jury's verdict" as to Count 2. *See Davis*, 336 Or at 32. After some consideration, we reach that conclusion for the following reasons. First, defendant's erroneously admitted statement is cumulative to defendant's statements that were properly admitted; the similarity of the statements lends support to our conclusion that the error was not likely to affect the jury's verdict on Count 2.

Second, defendant offered into evidence John Pruitt's and Corey Burdick's statements to police that described the events that defendant alluded to in his own statement, but in greater detail.[9] John Pruitt explained to the police that, before the fatal shot, Dean Pruitt jumped up and grabbed defendant and began "scuffling with [him] to try to get the gun away from him." Corey Burdick explained to the police that Dean Pruitt ordered defendant out of the house and had started pushing him when the shot fired. *See State v. Randant*, 341 Or 64, 74, 136 P3d 1113 (2006), *cert den*, ____ US ____ , 127 S Ct 1296 (2007) (concluding that, even if the defendant's waiver of his Article I, section 11, right to counsel was not valid, the error was harmless because the arguably inadmissible evidence "only sketched out the information" that was already properly admitted).

The evidence at trial also included the testimony of several witnesses, including Davey Phillips, Jassmon Belanger, John Pruitt, and Oscar Phillips,[10] who all testified that a struggle ensued between defendant and Dean Pruitt and that, at some point during that struggle, defendant shot Dean Pruitt. That testimony is consistent with defendant's erroneously admitted statement that he and Dean Pruitt "wrestled over the gun and fuck'n a shot got fired." Moreover,

---

[9] Corey Burdick was with defendant at the Pruitt residence on the night of the incident.

[10] Davey Phillips and Oscar Phillips are Belanger's grandsons; they live across the street from Belanger. Both Davey and Oscar Phillips were at the Pruitt residence on the night of the incident.

defendant's erroneously admitted statement did not add any additional information to or provide a different perspective from that of other evidence of defendant's conduct in shooting Dean Pruitt. *See State v. Poitra*, 206 Or App 207, 212, 136 P3d 87, *rev den*, 341 Or 245 (2006) ("If the disputed testimony is merely cumulative of other evidence that already established the same fact, then the error is harmless.").

Third, the erroneously admitted statement supported defendant's factual theory of the case, specifically, that he did not intend to kill Dean Pruitt. We recognize that, in many instances, a criminal defendant's own statements regarding the crime are especially persuasive and potentially more likely to affect the jury's verdict than other sources of the same information. *See State v. Shaff*, 209 Or App 68, 76, 146 P3d 389 (2006), *rev allowed*, 342 Or 473 (2007) ("A defendant's direct admission bears an important relationship to a jury's determination of its verdict[.]"). However, in this case, defendant's erroneously admitted statement actually supported his position at trial that he did not intend to kill Dean Pruitt. Moreover, defendant expressly stated, on more than one occasion in the interview, that he did not intend to kill Dean Pruitt. Accordingly, this is not a situation where the erroneously admitted evidence was a defendant's express admission of the crime, nor is it a situation where the erroneously admitted statement contradicts the defendant's theory of the case or precludes him from raising a particular defense. For all of those reasons, we conclude that there is little, if any, likelihood that the error affected the jury's verdict as to Count 2. Therefore, the error in admitting defendant's statement after the constitutional violation was harmless as to Count 2.

We turn to Count 5, pursuant to which the jury convicted defendant of attempted murder of John Pruitt with a firearm. ORS 163.115. During the police interview, defendant made only one statement that implicated his conduct toward John Pruitt; he made the statement after the constitutional violation and therefore it was erroneously admitted. In that statement defendant explained, "John fuck'n started comin at me. I didn't know what the fuck to do, man. I shot him in the stomach so he wouldn't fuck'n die."

After reviewing the record in its entirety, we cannot say that the error in admitting that statement had "little likelihood" of affecting the jury's verdict as to Count 5, because the statement was defendant's express admission that he shot John Pruitt and his intention in doing so. *See Shaff*, 209 Or App at 75-76 (error was not harmless because the erroneously admitted statement was the "defendant's only admission in connection with [the particular count]"). At trial, the state called witnesses who each provided testimony relevant to the jury's determination of defendant's intent in shooting John Pruitt: Davey Phillips testified that, after defendant shot Dean Pruitt, he "swung his gun around and fired" at John Pruitt; Jassmon Belanger testified that John stood up and was trying to approach defendant when defendant shot him; John Pruitt testified at trial that defendant shot him from three feet away; and Oscar Phillips testified that defendant stood approximately four feet from John Pruitt and, with a "straight arm forward," shot him.

Although the testimony of each of those witnesses was relevant to defendant's intent, defendant's own erroneously admitted statement, "John fuck'n started comin at me. I didn't know what the fuck to do, man. I shot him in the stomach so he wouldn't fuck'n die," contains something in addition to the other testimony; namely, the statement indicates that defendant consciously reflected, at least for a split-second, on his conduct prior to shooting John Pruitt in the stomach. Given that the central issue regarding Count 5 was whether defendant *intended* to cause the death of John Pruitt, and that defendant's erroneously admitted statement pertains directly to that issue, we cannot say there was little, if any, likelihood that the error in admitting that statement affected the jury's verdict. *See State v. Saunders*, 211 Or App 73, 84, 153 P3d 144 (2007) (erroneous admission of some of the defendant's statements to police was not harmless because the evidence adversely affected the defendant's credibility and "the central issue in the case" was whether the abuse, which the defendant denied, had occurred). Accordingly, the error in admitting defendant's statements made after the constitutional violation was not harmless as to Count 5.

■ We turn to Count 6, under which the jury found defendant guilty of the unlawful use of a weapon against Jassmon Belanger. ORS 166.220. Defendant did not make any statements during the interview that addressed his conduct toward Belanger specifically. However, after the constitutional violation, defendant did state that, "After I shot both [Dean and John Pruitt] they were all fuck'n yellin at me, and [Belanger] was yelling at me and shit. I fuck'n * * * fired a couple shots. I don't know, fired them up or down in the roof just to get everybody to be quiet."

In addition to defendant's statement that he fired shots into the ceiling or floor in Belanger's presence, there was evidence, at trial, that during the incident defendant intentionally attempted to use a deadly weapon against Belanger three additional ways. First, there was evidence that, prior to shooting Dean and John Pruitt, defendant pointed the gun at Belanger and threatened to "blow [Belanger's] head right off the top of her shoulders." That evidence came from several sources, most notably from the recorded statements of John Pruitt and Corey Burdick that defendant offered into evidence. In John Pruitt's interview with the police, he stated that, after defendant arrived at the residence, "he pulled out a gun and began to * * * threaten[ ] to shoot my mother[.]" In Corey Burdick's interview with police, he stated that defendant "looked over at [Belanger]. She was laying down. And um he pulls out a gun[.] * * * He gets up * * * looks at [Belanger] and he goes do you know your son's a drug dealer[.]"

Second, there was evidence that, after defendant shot Dean and John Pruitt, he entered a back bedroom where Belanger and Davey Phillips were attempting to call 9-1-1. Belanger and Davey Phillips testified that defendant pointed the gun at them and demanded that they hang up the phone.

Third, Belanger testified that defendant actually fired the gun at her while she was on the couch. She explained that "he was pointing the gun at me and then fired and I raised my leg * * * and * * * I think it went into the couch."

In his closing argument, the prosecutor generally mentioned the evidence that the state relied on to establish Count 6, suggesting that defendant "pointed [the] gun" at Belanger. Because there is significant evidence that defendant threatened Belanger with a gun in at least three different ways, and that defendant's erroneously admitted statement was not an admission that he specifically threatened Belanger, we conclude that there was little, if any, likelihood that the error in admitting those statements affected the verdict as to Count 6. Any error in admitting defendant's statements with respect to Count 6 was harmless.

■ Under Count 7, the jury found defendant guilty of the unlawful use of a weapon on Davey Phillips. ORS 166.220. Because defendant did not make any statements regarding Davey Phillips in his interview with police, we conclude that the trial court's error in admitting defendant's statements after the constitutional violation could not have had any effect on the jury's verdict as to Count 7. The error in admitting those statements as to Count 7 was harmless.

■ Under Counts 10 and 11, the jury found defendant guilty of the attempted aggravated murder of Ben Kauffman, ORS 163.095, and the attempted murder with a firearm of Ben Kauffman, ORS 163.115, respectively. The central issue in both counts was whether defendant intended to cause the death of Kauffman.

In the police interview, defendant made statements regarding Ben Kauffman only prior to the constitutional violation; accordingly, those statements were properly admitted. In the properly admitted statements, defendant explained that he "wasn't firin to try to hit [Kauffman] in the house * * *. I was just try'n to get in the fuck'n house." Further, when Officer David asked defendant what he was "trying to do" at the Kauffman residence, defendant replied, "I don't know. I was just trying to get in—try to get through the door 'cause I'd been * * * trying to bust the doors [and was] all fuck'n sore and shit." He further explained, "I was just try'n to blow the lock off" and was trying "to scare [Kauffman]" so he would give defendant the keys to his truck.

At trial, defendant's contention as to Counts 10 and 11 remained the same: he "intend[ed] to get in the house" and

"did not intend to harm Mr. Kauffman[.]" Because defendant's properly admitted statements support that contention, and because the erroneously admitted portion of the interview does not contain any statements regarding defendant's conduct toward Kauffman, we conclude that the error could not have affected the jury's verdict as to Counts 10 and 11, and therefore the error as to those counts was harmless.

■ Finally, we turn to Counts 19 and 20, under which the jury found defendant guilty of burglary in the first degree, with and without a firearm, of Sandra Rabine. ORS 164.225. The central issue as to Counts 19 and 20 was whether defendant intended to commit theft inside Rabine's residence. During the interview, defendant told the officers that, after Newell shot him, he went to Rabine's residence and "tried to talk [Rabine] into let[ting] me have her car to go away." That statement was the only direct evidence that defendant intended to commit theft inside Rabine's home.[11] Defendant made that statement after the constitutional violation, and accordingly, the statement was erroneously admitted into evidence. The state relied on defendant's erroneously admitted statement and the circumstantial evidence that defendant attempted to steal vehicles from other residences to establish his intent to commit theft inside Rabine's residence. Moreover, the state relied on defendant's statement that he "tried to talk [Rabine] into let[ting] [him] have her car" on two occasions during its closing argument. Accordingly, we cannot say that there was little likelihood that the error in admitting that statement affected the jury's verdict as to Counts 19 and 20; therefore, the error as to those counts was not harmless.[12]

---

[11] Although Rabine testified at trial, her testimony did not indicate that defendant intended to commit a crime inside her home; she testified that defendant only wanted to get inside and wanted her to call for help.

[12] Because we conclude that the officers violated defendant's rights under Article I, section 12, and we reverse his convictions on Counts 5, 19, and 20 on that ground, we do not reach defendant's Fifth Amendment arguments as to those counts.

In addition, we reject defendant's Fifth Amendment arguments as to Counts 2, 6, 7, 10, and 11 without discussion, because we conclude that, even if the admission of defendant's statement violated the Fifth Amendment, any error as to those counts would be "harmless beyond a reasonable doubt" under the federal harmless error standard. *See State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006) (citing *Delaware v. Van Arsdall*, 475 US 673, 681, 106 S Ct 1431, 89 L Ed 2d 674 (1986)).

We reject defendant's remaining assignments of error without discussion.

Convictions on Counts 5, 19, and 20 reversed; sentences vacated; remanded for resentencing; otherwise affirmed.

---

Although the federal harmless error test shifts the focus from the likely effect of the error on the jury's verdict to the strength of the state's case despite the evidentiary error, 340 Or at 544, for the reasons discussed in our state harmless error analysis above, we would conclude under the federal test that the error, if any, was harmless beyond a reasonable doubt as to Counts 2, 6, 7, 10, and 11.