STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

BRADLEY ANDREW HARDING,
*Defendant-Appellant.*

Multnomah County Circuit Court
Court Numbers: 0408-34289, 0409-34933,
0409-35138, 0410-35591, 0410-35617
A129125 (Control); A129126, A129127,
A129128, A129129

189 P3d 1259

Raymond S. Tindell argued the cause for appellant. On the brief were Peter A. Ozanne, Executive Director, Peter Gartlan, Chief Defender, Legal Services Division, and David Ferry, Deputy Public Defender, Office of Public Defense Services.

Anna M. Joyce, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Landau, Presiding Judge, and Schuman, Judge, and Ortega, Judge.

SCHUMAN, J.

## SCHUMAN, J.

Defendant appeals multiple judgments of conviction arising from incidents that occurred during a three-month crime spree.[1] He argues that the trial court erred, first, in denying his motion to suppress evidence of incriminating statements that he made to detectives during a custodial interrogation; second, in denying his motion to suppress physical evidence found in the apartment where he had been staying before his arrest; third, in joining the charges against him in a single prosecution; and fourth, in denying his motion for a judgment of acquittal on one of the charges. We affirm.

Because defendant was convicted by a jury, we state the facts in the light most favorable to the state. *State v. Charboneau*, 323 Or 38, 40-41, 913 P2d 308 (1996). We begin with a recitation, in chronological order, of the crimes of which defendant was convicted and the relevant circumstances of each.

On June 30, 2004, defendant was apprehended after stealing a car and then, after it stalled, asking a passerby to help him hot-wire it. Defendant was convicted of unauthorized use of a vehicle and possession of a stolen vehicle.

On August 14, 2004, Portland Police Officer Brown stopped defendant for speeding and for riding a motorcycle without a helmet. Brown ran a check on the license plate and discovered that the motorcycle was stolen. Defendant was convicted of unauthorized use of a vehicle and possession of a stolen vehicle.

On August 15, 2004, as defendant was loading various items into his car from a garage, a neighbor observed him and reported the activity to the garage's owner. Defendant was convicted of second-degree theft.

---

[1] Defendant was convicted on five counts of first-degree burglary, ORS 164.225; three counts of unauthorized use of a vehicle, ORS 164.135; two counts of possession of a stolen vehicle, ORS 819.300; first-degree robbery, ORS 164.415; first-degree theft, ORS 164.055; second-degree theft, ORS 164.045; and attempting to elude a police officer, ORS 811.540.

On August 16, 2004, a woman returned to her home to find that her watch had been stolen after a break-in. Fingerprints on glass near a broken window matched those of defendant. Defendant was convicted of first-degree burglary.

On August 22, 2004, Portland Police Officer Truong, responding to a report of suspicious activity, encountered defendant and another person attempting to pry open a garage door with a crowbar. Truong noticed a vehicle parked in the driveway and ran a check on the license plate. He discovered that the vehicle had been stolen. Defendant admitted to driving the vehicle. Defendant was convicted of unauthorized use of a vehicle.

On September 27, 2004, defendant was found inside a home by a friend of its occupants; the friend's suspicion had been aroused because the occupants' cars were not in the driveway, an unfamiliar motorcycle was parked there, and the front door was open. After a brief confrontation, defendant fled. When the occupants returned, they found a helmet in a back room; fingerprints on that helmet matched defendant's. Two jewelry items belonging to one of the occupants were later found among property confiscated from defendant at the scene of another crime. Defendant was convicted of first-degree burglary.

On September 28, 2004, a man returned home to find that the house he shared with his wife had been broken into. Defendant's fingerprints were found on the kitchen window and on various other objects in the home. The wife identified her watch, jewelry, and a jewelry case among property later confiscated from defendant. Defendant was convicted of first-degree burglary.

Also on September 28, 2004, Cash returned home to find that her house had been broken into. Among property later confiscated from defendant, Cash identified her jewelry case and several pieces of jewelry. Among the property seized by police from the apartment in which defendant had been staying before his arrest, she identified her planter, some carving knives, a guitar belonging to a friend, and a prescription bottle with her name on it. Defendant was convicted of first-degree burglary.

On September 29, 2004, Watson noticed an unfamiliar motorcycle parked in front of the house of his next-door neighbor. A helmet and bag were on the neighbor's front porch. Because he knew that his neighbor was not at home, Watson became suspicious and walked next door to investigate. After observing that the screens had been removed from the windows of the house and that the shed door had been left open, Watson encountered defendant as he was about to leave. To prevent defendant from leaving, Watson grabbed a bag that was hanging from the handlebars of the motorcycle parked in front of the house and ran back to his own house, placing the bag inside his front door. (Inside the bag, police later found items that defendant had stolen in the earlier crimes referenced above.) Watson then armed himself with an 18-inch club and returned to where defendant stood. Defendant pointed a gun at him and said, "You don't know who you're messing with. I'm a violent person." Keeping the gun pointed at Watson, defendant rode away on his motorcycle. When the homeowner returned, she found that her back patio door had been pried open and that her home had been ransacked. She also noticed that a small ceramic jewelry box was missing. Later that day, Watson was able to identify defendant from a police photo montage. Defendant was convicted of first-degree robbery, second-degree robbery, and first-degree burglary.

By this time, police had identified defendant as a suspect and had acquired information that defendant was staying with a friend named Wallace. Two police officers went to Wallace's home to investigate. Wallace invited them in and told them that he had been allowing defendant to store his belongings there. Wallace identified several items in the open area of his living room and told the officers that those items belonged to defendant. The officers seized the items, which included the guitar later identified by Cash as belonging to her friend, the planter and knives identified by Cash as hers, and the prescription bottle with Cash's name on it.

As a third officer was arriving at Wallace's apartment to help the officers who were already there, he encountered defendant entering the apartment complex parking lot

on a motorcycle. Spotting that officer, defendant fled. A high-speed chase ensued, with the vehicles reaching speeds of 80 miles per hour, but defendant escaped.

Defendant was finally apprehended in the early hours of the next morning, September 30, 2004. A Portland police officer responded to a report of a suspicious individual in a residential neighborhood and came upon defendant leaning over and rifling through a backpack in the front driveway of a house. The officer approached defendant and asked him what he was doing. Defendant responded that he was "going through [his] stuff" and identified himself as "Mark Harding." The "stuff" he was going through included a laptop computer, wireless computer mouse, headphones, knives and knife sheaths, a digital camera, and jewelry. Those items were later identified by another victim, Palmer. Defendant was convicted of first-degree theft on that basis.

The officer eventually arrested defendant, read him his *Miranda* rights, and placed him inside of a patrol vehicle. On the way to the police station, the officer addressed defendant as "Mark Harding," to which defendant responded, "No, my name's Brad Harding. * * * I thought I had warrants." Defendant then asked why he was being arrested. The officer answered, "[S]ome of our detectives would like to speak to you. You're being detained until they can speak to you." Defendant responded—and this response is the subject of his first assignment of error—"Man, I thought I had warrants. *I don't want to deal with these detectives.*" (Emphasis added.)

When the officer and defendant arrived at the police station a few minutes later, defendant was placed in a holding cell. The two officers who had visited Wallace's apartment were called into the station to interview defendant. They found him asleep in the holding cell, removed his handcuffs, and escorted him into an interview room. After giving defendant a few minutes to wake up and "gather himself together," and without reinforming him of his *Miranda* rights, the officers began to interview him.

During the interview, defendant made only two statements that could be considered incriminating. He stated that he viewed himself as "Robin Hood and that he only [took] things from people [who] have an overabundance of

\* \* \* things" and that "he only took from people that he knew." When asked specifically about the September 29 burglary during which he had encountered Watson, and "if he knew the man \* \* \* he had pointed a gun at \* \* \* [a]nd what [that] man \* \* \* had \* \* \* ever done to him," defendant stated, "Well, the guy should not have come at me with a stick," repeating that statement at least two other times during the interview. Defendant's other statements were unambiguously exculpatory.

■   In his first assignment of error, defendant asserts that the trial court should have granted his motion to suppress the statements that he made to police in response to questioning that occurred after he told an officer, "I don't want to deal with these detectives." That statement, defendant argues, was an unequivocal invocation of his right to remain silent; by continuing to question him thereafter, police violated his right to be free from compelled self-incrimination under Article I, section 12, of the Oregon Constitution[2] and the Fifth Amendment to the United States Constitution.[3] Even if the statement was equivocal, he argues, the officers were still required to ask follow-up questions to clarify what he meant before proceeding with an interrogation. The state responds that defendant did not invoke—equivocally or otherwise—his right to remain silent and that, regardless, if he did invoke his right and the court erred in failing to suppress subsequent statements, that error was harmless. We conclude that the trial court erred in admitting defendant's statements, but we agree with the state that the error was harmless.

■   We consider defendant's state constitutional claim first. *State v. Kennedy*, 295 Or 260, 262, 666 P2d 1316 (1983). Under Article I, section 12, police must stop interrogation when a suspect in police custody unequivocally invokes the right to remain silent. *State v. Meade*, 327 Or 335, 339, 963

---

[2] Article I, section 12, provides:

"No person shall \* \* \* be compelled in any criminal prosecution to testify against himself."

[3] The Fifth Amendment provides, in part:

"No person \* \* \* shall be compelled in any criminal case to be a witness against himself \* \* \*."

P2d 656 (1998). However, police may reinitiate contact with a defendant who has invoked that right, give new *Miranda* warnings, and obtain a valid waiver of the right after a reasonable period of time has elapsed.[4] *State v. Holcomb*, 213 Or App 168, 174, 159 P3d 1271, *rev den*, 343 Or 224 (2007) (citing *State v. Rowe*, 79 Or App 801, 805-06, 720 P2d 765, *rev den*, 302 Or 86 (1986)). When a suspect makes an equivocal invocation of the right to silence, police are required to ask follow-up questions to clarify what the suspect meant before proceeding with interrogation. *Charboneau*, 323 Or at 54. In determining whether a defendant's statement is an unequivocal or equivocal invocation, or neither, we view the statement in light of the totality of the circumstances at and proceeding the time that it was made, "to ascertain whether a reasonable officer in the circumstances would have understood that defendant was invoking his rights." *Holcomb*, 213 Or App at 176.

■    What transpired during a custodial interrogation, including what a defendant said or did not say, is a question of fact. *Id.* at 173. Whether a defendant's statements amount to an unequivocal invocation of his or her right against compelled self-incrimination, an equivocal invocation, or no invocation at all, is a question of law. *Id.* In this case, the trial court concluded that defendant's statement was not even an equivocal invocation:

> "I would agree that were it just the statement, 'I don't want to deal with [these] detectives,' * * * [that would] at least require * * * some further inquiry as to what he meant or whether, in fact he wanted to talk to the detectives.

> "But in the context of what was actually being said, he's giving * * * the arresting officer information about why he gave a fake name. He explains he thought he had warrants and then immediately says, 'I don't want to deal with these detectives.' * * * [T]hat whole statement is only reasonably interpreted in the context of why he gave the fake name.

---

[4] An invocation of the right to remain silent differs in this respect from an invocation of the right to counsel, which also arises under Article I, section 12. If a suspect unequivocally invokes his right to counsel, the police must cease all interrogation until an attorney is provided unless the suspect himself initiates further communication. *State ex rel Juv. Dept. v. Thai/Schmolling*, 138 Or App 354, 358, 908 P2d 844 (1995).

"Also, he's giving his name, explaining to the officer he thought he had warrants and he didn't want to deal with the detectives, and that's why he gave the fake name to the officer, so he didn't have to deal with the detectives.

"It seems to me the only reasonable explanation for that statement, 'I don't want to deal with [these] detectives,' is simply [defendant's] explanation as to why he gave a different name to the officer prior to his arrest. I'm denying the motion to suppress the statements."

We disagree with that legal conclusion.

The record shows that defendant's statement was made immediately after a police officer informed him that detectives wanted to speak to him and that he was being detained until they could do so. In such circumstances, a reasonable officer could have understood defendant's statement as, among other things, an expression of his desire to remain silent. Because neither the officer to whom the statement was made, nor the detectives who later interrogated him, asked clarifying questions to determine defendant's intent, nor sought to obtain a valid waiver, defendant's subsequent statements were obtained in violation of Article I, section 12.

■ Nonetheless, we agree with the state that the trial court's error in admitting defendant's statements was harmless. We must affirm the jury's verdict despite evidentiary error if there is little likelihood that the error affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). In our assessment of whether the erroneous admission of the statements was harmless, we describe and review all pertinent portions of the record, not just those portions most favorable to the state. *State v. Cunningham*, 179 Or App 359, 361-62 n 2, 40 P3d 1065, *adh'd to on recons*, 184 Or App 292, 57 P3d 149 (2002), *rev'd and rem'd on other grounds*, 337 Or 528, 99 P3d 271 (2004), *cert den*, 544 US 931 (2005).

We conclude that there is little likelihood, in light of the overwhelming evidence of defendant's involvement in the crimes of which he was convicted, that defendant's inculpatory statements—that is, that he was a kind of "Robin Hood" who took from those who had an "overabundance of * * * things" and only "from people that he knew," and that

Watson "should not have come at [him] with a stick"—would have affected the jury's verdict.

First, those statements are relevant only as to defendant's burglary, theft, and robbery convictions. Regarding his convictions for burglary and theft, the state was able to link defendant to each of those crimes using one or more of the following: (1) forensic evidence (that is, fingerprints), as in the August 16, September 27, and one of the September 28 burglaries; (2) eyewitness accounts, as in the August 15 second-degree theft case and in the September 27 and September 29 burglaries; and (3) property confiscated from defendant or seized by police from the Wallace residence and later identified by the victims, as in the first-degree theft case for which defendant was apprehended on September 30 and in the September 27 and both September 28 burglaries. Second, regarding defendant's robbery conviction and his statement that Watson "should not have come at [him] with a stick," we conclude that there is little likelihood that that implied admission would have affected the jury's verdict given Watson's first-hand account and the fact that the jury had no reason to disbelieve his testimony.[5]

■  We also conclude that, because defendant's statement was equivocal, the detectives did not violate his rights under the Fifth Amendment. Under that provision, unless a suspect unambiguously or unequivocally invokes the right to remain silent, police are under no obligation to cease interrogation. *Davis v. United States*, 512 US 452, 461-62, 114 S Ct 2350, 129 L Ed 2d 362 (1994). The Fifth Amendment does not obligate officers to ask clarifying questions regarding a suspect's intent in making an ambiguous or equivocal invocation. *Id.* at 461.

■  In his second assignment of error, defendant maintains that the trial court erred in denying his motion to suppress evidence seized from Wallace's apartment. He argues that the seizure from Wallace's living room of the items in plain view was unlawful because the incriminating character of those items was not immediately apparent. *See Horton v. California*, 496 US 128, 136, 110 S Ct 2301, 110 L Ed 2d 112

---

[5] Defendant did not testify in his own defense.

(1990) (essential predicate to valid warrantless seizure of an item in plain view is that its incriminating nature must be "immediately apparent"); *State v. Peterson,* 114 Or App 126, 130, 834 P2d 488, *rev dismissed,* 315 Or 272 (1992) (same).

There is some doubt as to whether defendant adequately preserved his claim of error at trial. In his pretrial motion, defendant argued only that the items were seized "without probable cause, without permissible consent and without exigent circumstances." At the hearing on that motion, defendant stated that he retained an expectation of privacy in the apartment and that there was "[n]o warrant, no exigent circumstances to justify what the detectives did in the apartment that day," contending that "all the evidence retrieved from the apartment should be suppressed as illegal search and seizure." The trial court took the issue under advisement. The state subsequently agreed to introduce only that evidence seized from the "open area" of Wallace's apartment that was in plain view, and the parties and the court thereafter returned to the issue of the admissibility of those items. Defendant then argued,

> "[S]earch and seizure are two separate acts, each requiring separate justification.
>
> "And even an authority to search is not an authority to seize. And here again we have no warrant. We have no exigency. And either one would be required for the detectives to seize any of the property in the apartment * * *."

The trial court ultimately ruled that "[a]nything [the detectives] saw in plain view that was not in closed containers, anything that was voluntarily given to them by Mr. Wallace was legally seized because they were legally there at the time."

On appeal, defendant correctly points out that his argument at trial included an argument "for suppression of all of the evidence seized, including the evidence in plain view." That argument, however, is not the same argument he now makes now on appeal. Defendant's argument at trial focused solely on defendant's privacy interest in the property. Defendant never argued at trial that the incriminating nature of the property in plain view was not immediately apparent, and the trial court was never given an opportunity

to address that issue. A claim of error is preserved for appeal when it is presented with enough specificity to allow the trial court to identify its alleged mistake and to immediately correct it. *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). Whether defendant met that standard presents a close question.

However, even if we were to conclude that defendant adequately preserved his claim of error at trial, we would nonetheless conclude that admitting the unlawfully seized items was harmless error. The court admitted four items, all of which were relevant only to the burglary charge involving the home of Cash. The items were a planter, some carving knives, an electric guitar, and a prescription medicine container. The incriminating nature of the electric guitar and the prescription bottle was immediately apparent; the officers who seized the items knew that defendant had brought them into Wallace's apartment; that Wallace believed many of defendant's possessions to be stolen; that one of defendant's earlier victims was Cash and that her name was on the label of the prescription bottle; and that a guitar had been stolen from Cash's boyfriend. Those items were sufficient to support defendant's conviction, so the suppression of the other two items would not have helped him. We therefore reject defendant's second assignment of error.

In his third assignment of error, defendant argues that the trial court erred in joining defendant's cases under ORS 132.560. That statute provides, in part:

"(1) A charging instrument must charge but one offense, and in one form only, except that:

"* * * * *

"(b) · Two or more offenses may be charged in the same charging instrument in a separate count for each offense if the offenses charged are alleged to have been committed by the same person or persons and are:

"(A) *Of the same or similar character;*

"* * * * *

"(3) If it appears, upon motion, that the state or defendant is *substantially prejudiced* by a joinder of offenses under subsection (1) * * * of this section, the court may

order an election or separate trials of counts or provide whatever other relief justice requires."

(Emphases added.) Before trial, the state moved to join the five cases pending against defendant on the ground that they were "of the same or similar character," explaining that "the defendant unlawfully acquired or was attempting to acquire the property of another (i.e., theft, robbery, burglary)." The trial court granted the motion over defendant's objection.

On appeal, defendant's argument is not primarily that the cases were not "of the same or similar character" under ORS 132.560(1)(b)(A), but that he was substantially prejudiced under ORS 132.560(3) because "the prior bad acts evidence from one case that would not have been admissible in a trial on the others created a plain and unreasonable risk of prejudicing the outcome of the jury's determination in each case." In particular, defendant argues that the "copious amounts of evidence" in the property crime cases against defendant would lead a reasonable juror to conclude that defendant was a "serial criminal" and thus guilty of robbery, the most serious crime for which he was convicted.

We review for legal error the trial court's determination that defendant failed to demonstrate that joining the charges against him would result in "substantial prejudice[ ]" under ORS 132.560(3). *State v. Luers*, 211 Or App 34, 43, 153 P3d 688, *adh'd to as modified on recons*, 213 Or App 389, 160 P3d 1013 (2007). Defendant, as the party objecting to joinder, had the burden of showing prejudice. *State v. Miller*, 327 Or 622, 626, 969 P2d 1006 (1998). In *Miller*, the Supreme Court concluded that, in enacting the "prejudice" standard in ORS 132.560(3) (1997), *amended by* Oregon Laws 1999, chapter 1040, section 17, the legislature intended to "authorize the court to safeguard the parties from potential injury or harm to their interests in a *fair trial*." 327 Or at 627 (emphasis in original). It further held that the mutual admissibility of evidence in separate trials on each of the cases sought to be joined under ORS 132.560, while probative to some degree as to whether joinder causes prejudice to a defendant, is not a requirement for joinder. Rather, the proper inquiry is whether the evidence would be admissible in a joint trial of all charges. *Miller*, 327 Or at 631-32. It is also noteworthy

that, after *Miller*, the legislature amended the statute to specify that joinder could be defeated only by a showing of *substantial* prejudice. Or Laws 1999, ch 1040, § 17.

■ In *State v. Barone*, 329 Or 210, 217, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2000) and *State v. Thompson*, 328 Or 248, 257, 971 P2d 879, *cert den*, 527 US 1042 (1999), the Supreme Court rejected the defendants' claims that they were prejudiced by the joinder of charges against them because those defendants did not support their claims with arguments based on the facts of their cases but, rather, made generalized arguments that the jury's consideration of one case might influence its consideration of another. "The mere assertion that evidence relating to some charges will influence the jury's consideration of other charges is insufficient" to establish substantial prejudice. *Luers*, 211 Or App at 43; *see also State v. Parker*, 119 Or App 105, 109, 849 P2d 1157, *rev den*, 317 Or 584 (1993) (acknowledging that the possibility of prejudice exists in any joinder situation).

Defendant makes precisely that type of argument here, asserting merely that the large amount of evidence in this case created a "plain and unreasonable risk" of prejudicing the jury's outcome. Furthermore, the trial court took great care to link each piece of evidence with the specific charge to which it applied, instructing the jury regarding each element of each alleged crime separately, and it specified the address to which each count corresponded on the jury verdict forms. *See Barone*, 329 Or at 217 (evidence that trial court required state to prove each charge on its own merits weighs against conclusion that the defendant was substantially prejudiced). Defendant's interest in a fair trial was thus adequately protected. Accordingly, we reject his third assignment of error.

■ In his fourth and final assignment of error, defendant argues that the trial court erred in denying his motion for a judgment of acquittal on the first-, second-, and third-degree robbery charges stemming from the September 29 incident in which defendant was confronted outside a house by a neighbor, Watson, and ultimately fled after brandishing a gun. At the close of the state's case, defendant moved for a judgment of acquittal on the ground that the state had failed to prove

that defendant brandished the gun with the intent to retain property or overcome resistance to the taking of property, as required for conviction of any degree of robbery. ORS 164.395; ORS 164.405; ORS 164.415. He argued that the evidence established, at most, that he was attempting to get away from Watson, who was armed with a club. Defendant further contended that the state failed to show that he had brandished the gun while in the course of committing or attempting to commit theft, also an element of robbery. The trial court denied the motion, and the jury returned a verdict of guilty.

We review the trial court's denial of defendant's motion for a judgment of acquittal to determine whether, viewing the record and all reasonable inferences from it in the light most favorable to the state, a rational juror could have found all elements of the offense beyond a reasonable doubt. *State v. Cunningham*, 320 Or 47, 63, 880 P2d 431 (1994), *cert den*, 514 US 1005 (1995). Under that standard, we conclude that the trial court did not err. The jury heard evidence that defendant brandished a gun at Watson after defendant had been found in front of a house in possession of three bags, at least one of which contained stolen property, that the house had been broken into, and that a ceramic jewelry box was missing. A rational juror could conclude beyond a reasonable doubt on those facts that defendant, while in the course of committing or attempting to commit a theft, threatened the immediate use of physical force on Watson by brandishing a gun, a deadly weapon, with the intent to retain the property that he had taken. We therefore reject defendant's fourth and final assignment of error.

Affirmed.