DEHOOG, P.J.
*408 *405 Defendant appeals a judgment of conviction entered after a jury found him guilty of first-degree manslaughter, ORS 163.118, a lesser-included offense of the murder defendant was charged with after fatally stabbing his brother, ORS 163.115. Defendant assigns error to the trial court's ruling denying his motion to suppress statements that he made to police following his arrest. He argues that, after he invoked his constitutional right to remain silent, the police did not wait a legally sufficient period of time before reinitiating conversation. He also argues that, because of that initial violation, evidence from two subsequent interviews must also be suppressed. Defendant alternatively argues that he did not knowingly and intelligently waive his right to remain silent, because he was under the influence of methamphetamine. Because we conclude that defendant's rights were not violated, we affirm.
The only issues on appeal arise from defendant's motion to suppress his custodial statements to the police; therefore, the relevant facts are those presented at defendant's suppression hearing. On July 3, 2014, Salem police officers arrested defendant and took him to the police station. At approximately 5:00 p.m., they brought defendant into an interview room, where they offered him water. At that time, Detective Tallan, who ultimately conducted the challenged interviews, advised defendant of his Miranda rights by reading them verbatim from a card. Tallan asked defendant if he had any questions, and defendant indicated that he understood his rights. Defendant signed the Miranda card. Tallan also read defendant his rights regarding requests for consent to search. Defendant subsequently gave verbal consent to a search of his person.
Tallan began his interview with defendant by asking him to provide background information, such as where he lived and with whom. Defendant told Tallan that he lived with his brother, the victim in this case. At 5:20 p.m., after Tallan asked defendant whether his brother was okay, defendant responded, "I don't want to say anything right now." Tallan confirmed that defendant did not want to say anything further at the moment and stopped his investigative *409 questioning. Tallan asked, however, whether the police could continue to collect physical evidence as previously discussed. Defendant agreed that they could, stating, "You may."
Officers proceeded to photograph defendant and collect his clothing. During that process, defendant asked Tallan whether he could withdraw his consent as to a blood draw. Tallan explained that he could withdraw his consent because "it's consent; you give it, you can take it away." Tallan further explained, however, that they would draw defendant's blood even without his consent because of the exigency involved. Defendant also asked whether he could revoke his consent to a DNA swab because his DNA was already "on file." Tallan again explained that defendant could revoke his consent, but told defendant that he would prefer to get the DNA directly from him. As officers continued collecting defendant's clothing, defendant, unprompted, said that he would consent to the DNA swab. After the officers finished their initial collection of evidence from defendant, Tallan took him back to the interview room. Throughout their encounter, Tallan asked defendant several times whether he needed to use the restroom or wanted water. Tallan also ordered defendant pizza.
At 6:03 p.m., defendant asked to smoke a cigarette, and Tallan and another officer took defendant outside so that he could. During that smoke break, defendant told them about a documentary that he had recently seen, but Tallan did not direct the conversation or question defendant at that time. Following *406 the break, the police returned defendant to the interview room and, in response to defendant's complaint that his head hurt, gave him chocolate.
According to Tallan, defendant was fidgety and unable to sit still. At times it appeared to Tallan as though defendant was having a conversation with someone who was not in the room. Tallan believed defendant's behavior was consistent with that of a person under the influence of a stimulant. Defendant told Tallan that he had used methamphetamine two or three days earlier and that he was still "coming down."
At 7:49 p.m., shortly after submitting to a blood draw, defendant asked to smoke another cigarette. During *410 the ensuing smoke break, defendant continued talking to Tallan. Tallan responded by asking defendant whether he had any questions and whether defendant wanted to know why he had been arrested. Defendant told Tallan that he already knew that. When Tallan asked defendant why he thought he was under arrest, defendant told Tallan that his brain was foggy. Tallan reminded defendant that he had said earlier that he did not want to say anything, explaining, "Earlier you said you didn't want to say anything, but, you know, you're continuing to talk to us so, you know, do you want to tell us what happened now? But obviously you don't have to." Tallan continued, "You said you didn't want to talk. You don't have to say anything, you know. We have what other people have told us." At that point, defendant interrupted Tallan and asked him, "Do you want me to tell you?" Tallan responded, "Yeah. As an investigator I do want you to tell me, but we're not going to have that conversation out here in the courtyard. We're going to go in and have it recorded in the interview room."
At 7:54 p.m., after returning to the interview room (where the recording of their interactions resumed), Tallan summarized the conversation that he and defendant had just had outside and asked defendant what he wanted to do. Defendant again interrupted Tallan, saying, "Well, I'm trying to tell you that." Tallan told him to go ahead but reminded defendant, "I can't threaten you. I can't make any promises. This is your choice. You need to decide what you want to do." Tallan did not formally readvise defendant of his Miranda rights, but, based on his conversation with defendant, Tallan believed that defendant understood that he did not have to talk. In the interview that followed, defendant described the events from that day that led to his brother's death. Defendant also provided explanations-which he later contradicted-for having stabbed his brother.
Tallan interviewed defendant again on July 6. Before that interview, Tallan again read defendant his Miranda rights from a card. Defendant acknowledged his rights verbally and signed the card. Tallan also interviewed defendant on July 7. Defendant had originally agreed to take a polygraph examination, but, when the police decided *411 to not pursue that, Tallan once again advised defendant of his Miranda rights and briefly interviewed him yet again.
At the suppression hearing, the trial court reviewed part of the video recording of the interview and observed that defendant appeared anxious and fidgety during the interview. The court stated, however, that "at no time" did the video suggest that defendant did not understand the questions. In the court's view, it showed that defendant gave appropriate responses. As to defendant's right to remain silent, the court found that Tallan had advised defendant of his Miranda rights, specifically noting that defendant had taken time-27 seconds-to review the Miranda card. Finally, the court concluded that defendant had invoked his right to remain silent when he said, "I don't want to say anything right now."
The trial court made additional findings regarding the conversation that took place after defendant's second smoke break. First, the court noted that defendant was sitting tall in his chair and seemed relaxed. The court found that defendant was "very clear about his intention, [and] the voluntariness of [his] statement[.]" Specifically, the court found that Tallan did not exert any duress or pressure on defendant and that defendant was not under the influence of any intoxicant to such a degree that he could not validly waive his rights. The court further found that Tallan had made it clear to defendant that he *407 did not have to talk to him and that defendant had "very clearly" said, " 'I want to tell you what happened.' " Therefore, the trial court concluded:
"So I find that the second-the bulk of the interview-well, the full interview on July 3rd, second interview on July 3rd with Detective Tallan-that it-that the Defendant invoked his right to remain silent, and then he was able to intentionally relinquish that revocation [sic ] and then intelligently waived his right, and that he understood that he had the right to remain silent and decided to then speak to the officers. I don't find that the officers had to give out the full Miranda warning before continuing.
"So I'll deny the motion to suppress the July 3rd statement to Detective Tallan, and that is the full-what I would say is the recorded interview from July 3rd."
*412 At a continuation of the suppression hearing, after the trial court had reviewed the recording in its entirety, the court reaffirmed its earlier ruling and explained:
"You had been advised of your rights in the beginning. He didn't fully advise you of your rights at this instant, but I think, in further reading the case law, if you initiate the contact they don't have to fully advise you of your rights. Even if the Court of Appeals determines that you didn't initiate the contact, I find that the circumstances surrounding that incident are such that you were advised of your rights-fully advised of your rights-once that the advice that the officer was giving you during that second incident were the advice with regards to the right that you were trying to now give consent to after first invoking that right; now you wanted to go ahead and waive that right."
On appeal, defendant assigns error to the trial court's denial of his motion to suppress. Defendant argues that, after he unequivocally invoked his right to remain silent, the police reinitiated questioning without waiting a legally sufficient period of time, that is, a period of time that was reasonable under the circumstances. Therefore, defendant contends, the court should have suppressed the statements that defendant made during that interrogation. Defendant further argues that the statements that he made during the two subsequent interviews must also be suppressed because those statements were the product of the earlier Miranda violation. Finally, defendant argues that, even if we conclude that defendant's statements were not the product of unlawful police conduct, we should exclude those statements on the ground that he was too intoxicated to knowingly and intelligently waive his Miranda rights.
In response, the state argues that Tallan waited a reasonable period of time after defendant invoked his right to remain silent and sufficiently readvised defendant of his Miranda rights; therefore, Tallan was permitted to resume questioning and the trial court properly denied defendant's motion to suppress. The state further argues that the trial court's finding that defendant's level of intoxication did not prevent him from knowingly waiving his right to remain silent is supported by evidence in the record.
*413 We review the denial of a motion to suppress for errors of law. State v. Brummer , 196 Or. App. 439, 444, 102 P.3d 695 (2004), rev. den. , 338 Or. 363, 109 P.3d 797 (2005). We are bound by a trial court's express findings of fact when those findings are supported by constitutionally sufficient evidence. Id. And, because we presume that the trial court implicitly made the findings of fact necessary to support its ultimate conclusion, those implicit findings are likewise binding on us if they are supported by the record. State v. Hensley , 281 Or. App. 523, 526, 383 P.3d 333 (2016).
Defendant's argument on appeal is rooted in Article I, section 12, of the Oregon Constitution.[1] By specifically providing that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself,"
*408 Article I, section 12, guarantees the right to remain silent. A person may waive that right. State v. Vondehn , 348 Or. 462, 474, 236 P.3d 691 (2010). But, to ensure that a person's waiver is knowing and voluntary, " Article I, section 12, requires that the police inform a person subjected to custodial interrogation that he or she has a right to remain silent and to consult with counsel and that any statements that the person makes may be used against the person in a criminal prosecution." Id. And, if police fail to give that warning, "a court must suppress not only the statements that a suspect makes in direct response to unwarned questioning but also evidence that derives from or is a product of that constitutional violation." State v. Avila-Nava , 356 Or. 600, 608, 341 P.3d 714 (2014).
Further, it is well settled that, "[w]hen a suspect in police custody unequivocally invokes the right to remain silent or the right to counsel, all police interrogation must cease." State v. Holcomb , 213 Or. App. 168, 173, 159 P.3d 1271, rev. den. , 343 Or. 224, 168 P.3d 1155 (2007) ; see also Michigan v. Mosley , 423 U.S. 96, 100, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). Here, there is no dispute that defendant unequivocally invoked his right to remain silent when he told Tallan, "I don't want to say *414 anything right now." Nor is there any dispute that defendant did not reinitiate conversation with Tallan following that invocation.[2]
We turn, therefore, to whether Tallan validly reinitiated conversation with defendant. After a suspect asserts his or her right to stay silent, the police may, under certain circumstances, reinitiate contact and obtain a valid waiver of that right. State v. Rowe , 79 Or. App. 801, 805-06, 720 P.2d 765, rev. den. , 302 Or. 86, 726 P.2d 1185 (1986) (adopting the federal approach under the Fifth and Fourteenth Amendments to the United States Constitution for purposes of Article I, section 12 ).[3] Under that rule, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning' was 'scrupulously honored.' " Mosley , 423 U.S. at 104, 96 S.Ct. 321 ; Rowe , 79 Or. App. at 806, 720 P.2d 765 (expressly agreeing with Mosley ). Under Mosley and other cases, various factors may be relevant in assessing whether a suspect's right to cut off questioning was scrupulously honored, including: the amount of time between interrogations, whether the Miranda warnings were renewed, the scope of the second interrogation, and the zealousness of the officers in questioning. Mosley , 423 U.S. at 104-06, 96 S.Ct. 321 ; Rowe , 79 Or. App. at 806, 720 P.2d 765 (if a suspect has invoked his right to silence, there is "no reason to prohibit the police from reminding the suspect of his rights and again asking if he will waive them after a reasonable time has elapsed," provided that the police "do not act in a way which affects the suspect's ability to make a knowing and voluntary decision about waiver"). This is an inquiry into all of the relevant facts; the list is not exhaustive and no one factor is determinative. Easley v. Frey , 433 F.3d 969, 972-73 (7th Cir 2006) ; United States v. Hsu , 852 F.2d 407, 410 (9th Cir 1988).
Thus, defendant's appeal turns on whether the trial court correctly determined that Tallan had scrupulously *415 honored defendant's right to remain silent. Given the circumstances of this case, we conclude that the trial court did not err. That is, Tallan did not violate defendant's right to remain silent by reinitiating interrogation when he did, and the trial court therefore properly denied defendant's motion to suppress.
We base our conclusion that Tallan scrupulously honored defendant's right to cut off questioning on several factors identified in Rowe and Mosley . First, approximately two and a half hours passed between defendant's *409 invocation of his right to remain silent and Tallan's reinitiation of questioning. See, e.g. , Rowe , 79 Or. App. at 806, 720 P.2d 765 (recognizing that police may reinitiate questioning "after a reasonable time has elapsed"); Mosley , 423 U.S. at 106, 96 S.Ct. 321 (describing two hours as "the passage of a significant period of time"); cf. State v. McAnulty , 356 Or. 432, 457, 338 P.3d 653 (2014), cert. den. , --- U.S. ----, 136 S. Ct. 34, 193 L.Ed.2d 48 (2015) (concluding that, after suspect's invocation, police violated her right to remain silent by waiting only one minute before reentering the room and asking her the same question).
Second, in that two-and-a-half-hour period, the police focused on gathering physical evidence and left defendant alone in the interview room for significant stretches of time. The verbal interactions that officers had with defendant during that time were limited to either addressing his comfort-offers of food, water, and smoke breaks outside-or to explaining defendant's rights in relation to the collection of physical evidence. For example, as noted, after defendant invoked his right to remain silent, he asked Tallan whether he could revoke his consent for the blood draw. Tallan explained that defendant could revoke his consent, but that the police still would collect his blood due to the exigency. Similarly, when defendant asked whether he could revoke his consent to a DNA swab, Tallan again explained that he could revoke his consent. Defendant paused briefly, then, unprompted, told Tallan that he would consent to the swab.
Third, before Tallan reinitiated questioning following the second smoke break, he also provided defendant two generalized reminders of the Miranda rights that defendant *416 had invoked earlier. See, e.g. , Rowe , 79 Or. App. at 806, 720 P.2d 765 (police may reinitiate contact "[s]o long as they do not act in a way which affects the suspect's ability to make a knowing and voluntary decision about waiver"); Mosley , 423 U.S. at 105-06, 96 S.Ct. 321 (resumed interrogation was permissible where police did not persist in "repeated efforts to wear down" the suspect; rather, police resumed questioning after two hours and providing a fresh set of Miranda warnings). According to Tallan, he reminded defendant during the smoke break that defendant had told him that he did not want to talk and that defendant did not have to talk to him. Once back in the interview room where their interactions were recorded, Tallan again reminded defendant of his earlier invocation and reiterated that defendant did not have to talk to him and should only do so if he wanted. Although Tallan did not fully or formally readvise defendant of his Miranda rights, the two generalized reminders that Tallan did give were sufficient under the circumstances; that is, where defendant had been formally advised of his Miranda rights only two and a half hours earlier and defendant's intervening discussion and ultimate waiver of his right to deny consent to search reflected his capacity to understand and consciously exercise his constitutional rights, we see no reason to believe that defendant's ability to knowingly and voluntarily exercise-or waive-his right to remain silent had in any way been compromised. See Rowe , 79 Or. App. at 806, 720 P.2d 765.
Under those circumstances, we are persuaded that defendant's right to cut off questioning was scrupulously honored, and that the trial court therefore did not err in denying defendant's motion to suppress based on Tallan's alleged failure to wait a reasonable time before reinitiating interrogation.
Defendant argues in the alternative that he did not knowingly and intelligently waive his right to remain silent because he was under the influence of methamphetamine. At the suppression hearing, after having viewed the full video recording of the interview, the trial court found that defendant was not under the influence to such a degree that he could not waive his Miranda rights or consent to the searches of his person. The court explained:
*417 "But again, what the Court is looking for is whether or not you were capable of giving consent; whether it was knowing consent. And in reviewing the full tape, I still find that you were capable of giving consent. You asked appropriate questions. When you didn't understand words you asked, 'What does that mean,' and you would repeat back things. And so it was *410 clear that you were understanding what was going on.
"It was just also clear that you were under the influence of something and that that-I don't think that the level of your intoxication or being under the influence of some substance, I don't think that that was to such a degree as to negate the voluntariness of your consent for the taking of the evidence; your clothing, the swabs, your blood.
"* * * * *
"And it may be that as time [went] on you seemed a little bit more under the influence. But then after you came back after that second break and had had something to eat you were more coherent after the second break, when you were finally telling the story and certainly able to tell your side of the story.
"So for whatever that's worth, for the record, I just wanted to clarify that about the intoxication or being under the influence of some sort of substance, but that that didn't negate the voluntariness of the consent or his fully knowingly waiving his rights."
The state argues that evidence in the record supports those express findings as to defendant's level of intoxication, and that, in light of those findings-by which we are bound-the trial court did not err in concluding that defendant had the requisite mental capacity to knowingly waive his right to remain silent.
It is the state's burden to demonstrate that defendant knowingly, intelligently, and voluntarily waived his Miranda rights for his statements to be admissible. State v. Corona , 60 Or. App. 500, 505, 655 P.2d 216 (1982). "The 'knowing and intelligent' prong of the waiver analysis tests whether, under the totality of the circumstances, the defendant 'knew that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time.' "
*418 State ex rel. Juv. Dept. v. Deford , 177 Or. App. 555, 573, 34 P.3d 673 (2001) (quoting Colorado v. Spring , 479 U.S. 564, 574, 107 S.Ct. 851, 93 L.Ed.2d 954 (1987) ).
In this case, the trial court expressly found that, although it was evident that defendant was under the influence, he was still capable of knowingly waiving his rights. Specifically, the court found that defendant asked appropriate questions and sought clarification for words that he did not understand. The court further found that, at the time of the second smoke break, when defendant agreed to again speak with Tallan, he appeared more coherent than he did at other points in the recording. Those findings are supported by the evidence in the record and therefore binding on appeal.
The trial court found that defendant understood his rights and that, despite his apparent intoxication, he was able to clarify things that he did not understand. Given those findings and that the record supports them, we conclude that the state has satisfied its burden of establishing that defendant knowingly, intelligently, and voluntarily waived his right to remain silent. Accordingly, the trial court did not err by denying defendant's motion to suppress on that ground.
Affirmed.

Although defendant cites applicable provisions of both the state and federal constitutions, he does not separately develop a federal constitutional argument. Accordingly, we limit our analysis to Article I, section 12, though our discussion is informed by certain federal standards that our case law has adopted into our state constitutional analysis.

Although the trial court appears to have found otherwise, the state concedes on appeal that there is no evidence to support the finding that defendant reinitiated conversation with Tallan.

Notably, although not at issue in this case, if a suspect invokes his or her right to counsel, rather than right to remain silent, the police must cease all questioning and may not reinitiate contact. See State v. Acremant , 338 Or. 302, 321-22, 108 P.3d 1139, cert. den. , 546 U.S. 864, 126 S.Ct. 150, 163 L.Ed.2d 148 (2005).