AOYAGI, J.
*123 This is a state's appeal of an order granting defendant's motion to suppress. See ORS 138.045(1)(d). Defendant is charged with 12 counts of first-degree assault, ORS 163.185. Before trial, he moved to suppress evidence of statements that he made during three police interviews, asserting that all of the statements were made involuntarily and that some of the statements were made after he invoked his right to remain silent. The trial court granted in part and denied in part defendant's motion. It concluded that defendant had equivocally invoked his right to remain silent during the third interview and that the police had failed to ask clarifying questions, so it suppressed defendant's statements after the invocation. As to voluntariness, the court concluded that all of defendant's statements before the invocation were voluntary, and it did not rule on the voluntariness of his statements after the invocation because it had already ruled to suppress those statements. The state appeals the order granting defendant's motion to suppress. For the reasons that follow, we reverse and remand.
FACTS
The relevant facts are undisputed. On September 22, G, a three-month old baby, was *470 admitted to Rogue Valley Medical Center with serious injuries. G had a subdural hematoma and had eight bone fractures to his skull, arms, shoulders, ribs, and one leg. G also was suffering from anemia, vomiting, fever, and a bulging fontanelle. The next day, G was transported to OHSU Doernbecher Hospital in Portland for additional treatment. He was discharged from that hospital on September 25, but then was readmitted on September 30 because he was having seizures. On October 3, G was again discharged and returned home with his mother.
During the same time period, the police interviewed defendant, G's father, on three occasions. The first two interviews took place at the hospital in Portland on September 24 and 25. The details of those interviews are not relevant to our resolution of this appeal. The third interview took place at the sheriff's office in Medford on September 30. That *124 interview began at 12:33 p.m. After defendant heard and waived his Miranda rights, Detective Denney questioned defendant regarding G's life, G's current situation, and what could have caused G's injuries. Along the way, Denney told defendant that, based on her conversations with the doctors and a child abuse specialist, "there's absolutely no way this child was injured accidentally or by a child." Denney also said that "the more the doctors know about how [the brain injury ] was caused, the better they can treat that and so we've got to find that out." Defendant denied any knowledge of how G had been injured,[1] and he agreed to take a polygraph examination.
At 1:57 p.m., after a short break, Denney said that they had a few more questions while the polygraph was being set up. Detective Sigler-who had been present during Denney's earlier questioning-then gave a lengthy explanation as to why he felt that defendant's demeanor was inconsistent with his claims that he knew nothing about how G was injured. Sigler stated that he found defendant's description of his weekends alone with five children difficult to believe, given his own experiences alone with two children. Sigler noted defendant's lack of emotion and seeming lack of interest in the details of G's injuries, which was "not normal" in Sigler's view and "tells me some things and tells Detective Denney some things." He also pointed out to defendant that defendant had "never expressed any anger over how this might have happened to [his] child, which is very telling." All of that led Sigler to conclude that defendant was "the reason that [G] has his injuries," and he encouraged defendant to admit if he was lying and had lost his temper. After hearing out Sigler, defendant responded:
"[Defendant]: I'm sorry that-and anybody who knows me will vouch for this, I am very reserved. Am I pissed? Absolutely. Am I sad? Absolutely. I don't know what to do at this point. I'm tired of these interviews. I want to be with my family.
"[Sigler]: Okay.
*125 "[Defendant]: And bring in a lie detector test. I don't know. I'm at-I-I want my-I want normalcy. I want my family.
"[Sigler]: Okay. We can do that. We'll do it today."
Defendant continued to deny injuring G. Defendant then took a 12-question polygraph examination, administered by Strickland, three times in a row.
At 5:18 p.m., Strickland told defendant that the polygraph results indicated that he was "clearly and conclusively not telling [Strickland] the truth to the questions about [G]." Upon being urged to tell the truth, defendant again denied injuring G.
At defendant's request, they took a break from 5:52 p.m. until 6:31 p.m. When the interview resumed at 6:31 p.m., defendant began making incriminating statements. Those statements resulted in defendant's arrest around 8:00 p.m.[2]
*471 A grand jury indicted defendant on 12 counts of first-degree assault of G. Before trial, defendant moved to suppress all of his statements from the three police interviews. Defendant argued that he made the statements involuntarily as a result of coercion, particularly related to G's medical treatment. As an alternative or additional basis to suppress some of the statements, defendant argued that he had invoked his right to remain silent at 2:05 p.m. in the third interview when he said, "I'm tired of these interviews. I want to be with my family." He claimed that that statement was either an unequivocal invocation, in which case the officers were required to stop questioning him immediately, or an equivocal invocation, in which case the officers were required to ask clarifying questions, which they did not. The state responded that what defendant said was not an invocation at all. Alternatively, the state argued that, if it was an invocation, it was equivocal, and that defendant's *126 immediate next statement clarified his intent and obviated the need for the officers to ask clarifying questions.
The trial court granted in part and denied in part defendant's motion to suppress. It addressed the invocation issue first. The court rejected defendant's argument that the statement at issue ("I'm tired of these interviews. I want to be with my family.") was an unequivocal invocation of his right to remain silent, ruling that "that's not an unequivocal invocation." The court concluded that the statement was, however, an equivocal invocation. As for whether the officers needed to ask clarifying questions, the court concluded that they did, notwithstanding that defendant had reinitiated the conversation by requesting to take the polygraph:
"[PROSECUTOR]: State v. Holcomb [213 Or. App. 168, 159 P.3d 1271 (2007) ] says that the defendant validly waived his right to remain silent by voluntarily reinitiating conversation with detectives about the investigation.
"THE COURT: * * * [T]he question is, in your case, is when he said, 'I just want to take the poly.' Was that reinitiating it right off the bat? He did not give the other side-the detective-an opportunity to inquire further before he started back into his interview process is what you're telling me. That's what your argument is.
"[PROSECUTOR]: Correct. And that is in line with State v. Meade [327 Or. 335, 963 P.2d 656 (1998) ] on that.
"THE COURT: I do find though that the officer could have inquired after that just to cover their bases and not put this at issue. That would have been the way to go. But could have inquired after that. You know, 'You just said, before you take the poly, you just said you were tired of this,' you know.
"[PROSECUTOR]: Mmm-hmm.
"THE COURT: You know, I believe the officer should have done that. So any statements-so I am going to find that that-any statements after that statement was given are suppressed."
The trial court then addressed the voluntariness of defendant's statements in the three interviews. It concluded that all of defendant's statements up until 2:05 p.m. on September 30, when defendant said that he was tired and *127 wanted to be with his family, had been voluntary. Because it had already ruled to suppress the statements that defendant made after 2:05 p.m., the court did not rule on the voluntariness of those statements. Defendant asks us to "assume" that the court concluded that his statements after 2:05 p.m. were involuntary. However, based on the court's oral ruling and its written order, we understand that the court did not rule on the voluntariness of defendant's statements after 2:05 p.m.
On appeal, the state argues that defendant did not invoke his right to remain silent or, if he did, that he invoked equivocally and promptly reinitiated the interview and thus obviated the need for the officers to ask clarifying questions. Defendant counters that the trial court correctly suppressed his statements based on his invocation of the right to remain silent.[3] Alternatively, defendant urges *472 us to affirm the suppression ruling on the alternative basis that defendant's statements were involuntary.
INVOCATION OF THE RIGHT TO REMAIN SILENT
Under Article I, section 12, of the Oregon Constitution, individuals have a right against compelled self-incrimination in criminal prosecutions, including the right to remain silent. State v. Schrepfer , 288 Or. App. 429, 435, 406 P.3d 1098 (2017). To protect the right, law enforcement officers must give Miranda warnings to individuals who are in custody or otherwise in compelling circumstances. State v. Nichols , 361 Or. 101, 107, 390 P.3d 1001 (2017). Individuals may waive the right to remain silent but must do so knowingly, intelligently, and voluntarily. State v. Bush , 291 Or. App. 407, 417, 421 P.3d 403 (2018). The right to remain silent includes the "right to cut off questioning" after an initial waiver. Id. at 414, 421 P.3d 403.[4] "[I]f there is a right to remain silent that *128 is guaranteed by Article I, section 12, it is a right to insist that the police refrain from interrogation after a person who is in custody or otherwise in compelling circumstances has invoked the right to remain silent." State v. Davis , 350 Or. 440, 459, 256 P.3d 1075 (2011).
There are two types of invocation under Oregon law-unequivocal and equivocal. "If a suspect unequivocally invokes his or her right against compelled self-incrimination during a custodial interrogation, then police must honor that request and stop the interrogation." Nichols , 361 Or. at 107, 390 P.3d 1001. If a suspect equivocally invokes the right, then police either must stop the interrogation or may ask neutral clarifying questions to ascertain whether the suspect intended to invoke. State v. Avila-Nava , 356 Or. 600, 609, 341 P.3d 714 (2014). "To determine whether a defendant made an unequivocal or equivocal invocation, or neither, we view the statement in light of the totality of the circumstances at and preceding the time that it was made, to ascertain whether a reasonable officer in the circumstances would have understood that defendant was invoking his rights." State v. Doser , 251 Or. App. 418, 423, 283 P.3d 410 (2012) (internal quotation marks and alterations omitted). "An invocation is equivocal * * * when the suspect's statement or request is subject to more than one reasonable interpretation, one of which is that he or she is invoking the right [at issue]." State v. Roberts , 291 Or. App. 124, 132, 418 P.3d 41 (2018).
At the same time, "a suspect's own actions may, in a given case, eliminate any need for clarification by the officers." Meade , 327 Or. at 340, 963 P.2d 656. "An officer's duty to clarify a suspect's equivocal invocation may be obviated if the suspect initiates further substantive conversation concerning the investigation before the officer has clarified the suspect's intent." Holcomb , 213 Or. App. at 174, 159 P.3d 1271. "Thus, after an equivocal invocation, a suspect can waive his rights by reinitiating substantive conversation with the officers in a manner that evidences a willingness and a desire for a generalized discussion about the investigation." Id. (internal quotation marks omitted).
"We review for error of law-that is, we determine as a matter of law whether defendant's statement amounted *129 to an unequivocal invocation or, if not, then whether it amounted to an equivocal invocation or no invocation at all." Nichols , 361 Or. at 106, 390 P.3d 1001.
In this case, the trial court ruled that defendant equivocally invoked his right to remain silent when he said, "I'm tired of these interviews. I want to be with my family." In reviewing the correctness of that legal determination, we must "consider those words, in the context of the totality of circumstances existing at the time of and preceding *473 their utterance." Avila-Nava , 356 Or. at 613, 341 P.3d 714. That is, we consider not only the alleged words of invocation themselves but also "the preceding words spoken by the defendant and the interrogating officer, the demeanor, gestures, and speech patterns of the defendant, the demeanor and tone of the interrogating officer, and the point at which the defendant allegedly invoked the right to remain silent." Id. at 614, 341 P.3d 714.
Without context, defendant's statement that he was tired and wanted to be with his family could be understood as an equivocal invocation of his right to remain silent. However, in the context of the totality of circumstances existing at the time of and preceding that statement, a reasonable officer would not have understood it as such. That is, whether or not defendant subjectively intended to invoke his right to remain silent, a reasonable officer would not have understood the words that he said in the context that he said them as an equivocal invocation.
The words that defendant said were, "I'm tired of these interviews. I want to be with my family." Defendant did not say those words out of the blue, however, or in a context that suggested that he was trying to end the interview. He said them as part of his response to a lengthy explanation from Sigler as to why Sigler believed that defendant was responsible for G's injuries, including defendant's apparent lack of interest in the details of G's injuries and defendant's apparent lack of anger about how they occurred. In response to Sigler's statements, defendant said that he was "sorry," that anyone who knew him would vouch that he is "very reserved," that he was "absolutely" pissed, that he was "absolutely" sad, but that he didn't "know what to do at *130 this point." He was "tired of these interviews" and wanted "to be with [his] family."
In context, the only reasonable interpretation of the latter statement was that it was part of defendant's attempt to persuade Sigler that Sigler's interpretation of defendant's demeanor was mistaken. A reasonable officer would not have understood the statement, in context, to be an equivocal invocation of the right to remain silent. At both parties' request, we also have watched the video of the interview, and nothing in it supports a contrary conclusion.[5] The video shows that Sigler's demeanor was calm and conversational, despite the serious subject matter. Nothing about defendant's demeanor, gestures, or speech patterns suggests that he was trying to stop the questioning, rather than continue it in the hopes of satisfying the police that he was not the cause of G's injuries. Finally, the timing of what defendant said was not especially suggestive of an invocation of the right to remain silent. Defendant had cooperated in three interviews over a week-long period, was waiting to take a polygraph that he had agreed to take, and was in the midst of addressing Sigler's statements.
This case is therefore different, for example, from State v. Harding , 221 Or. App. 294, 189 P.3d 1259 (2008). There, the defendant was arrested, read his Miranda rights, and placed in a patrol car. On the way to the police station, an officer addressed the defendant by a certain name, and the defendant responded with his real name and said that he "thought [he] had warrants." Id. at 299, 189 P.3d 1259. The defendant asked why he was being arrested, and the officer answered that he was being detained for some detectives to speak to him. The defendant immediately said, "Man, I thought I had warrants. I don't want to deal with these detectives." Id. We concluded that, in those circumstances, the defendant's last statement was an equivocal invocation because "a reasonable officer could have understood [it] as, among other things, an expression of [defendant's] desire to remain *131 silent." Id. at 302, 189 P.3d 1259. By contrast, in this case, not only was defendant's statement itself vaguer, but the context in which he made it was much different. *474 We conclude that defendant's statement, in the context in which it was made, was not an equivocal invocation of his right to remain silent. Moreover, to the extent that it is a close question, defendant's subsequent statement clarified that he did not mean to invoke his right to remain silent. "An officer's duty to clarify a suspect's equivocal invocation may be obviated if the suspect initiates further substantive conversation concerning the investigation before the officer has clarified the suspect's intent." Holcomb , 213 Or. App. at 174, 159 P.3d 1271. Here, immediately after defendant made the statement that he identifies as an invocation, there was a brief pause, Sigler said "okay," and then defendant said, "And bring in a lie detector test." Thus, defendant resolved any arguable ambiguity himself by making clear that he wanted to move forward with the interview and the polygraph examination that he had previously agreed to take.[6] Although the state does not rely on it, defendant's further statement-"I want normalcy. I want my family."-also tended to clarify that his earlier statement referred not to a desire to stop talking but to a larger desire for his life and his family to go back to normal. Once defendant clarified his own statement, any need for the officers to do so was obviated. See Meade , 327 Or. at 340, 963 P.2d 656 (officers did not need to ask clarifying questions because suspect's own conduct clarified his intent).
In sum, we conclude that the officers did not violate defendant's right to remain silent under Article I, section 12, of the Oregon Constitution. The trial court erred in ruling that they did.
*132 INVOLUNTARINESS AS AN ALTERNATIVE BASIS TO AFFIRM
We next consider defendant's argument that, if he did not invoke his right to remain silent, we nonetheless should affirm the trial court's grant of his motion to suppress on the alternative basis that his statements were involuntary.
Defendant argued to the trial court that the statements at issue were involuntary. As such, we need not consider whether the record is materially "the same one that would have been developed had the prevailing party raised the alternative basis for affirmance below." Outdoor Media Dimensions Inc. v. State of Oregon , 331 Or. 634, 659-60, 20 P.3d 180 (2001) (stating requirements to affirm on alternative basis when issue was not raised in the trial court). Rather, the question is whether there are disputed factual issues that require resolution before the ultimate legal question may be answered. See State v. Lovaina-Burmudez , 257 Or. App. 1, 14, 303 P.3d 988 (2013) (stating that, "with respect to alternative grounds for affirmance raised before, but not resolved by, the trial court, [we] will ordinarily remand to the trial court to determine potentially dispositive questions of fact in the first instance").
Whether a person's statements during a custodial interrogation were voluntary under Article I, section 12, of the Oregon Constitution is ultimately a question of law. State v. Ruiz-Piza , 262 Or. App. 563, 564, 325 P.3d 802 (2014). However, the test for voluntariness is highly fact dependent. It is "whether, under the totality of the circumstances, the waiver of rights and the confession were the product of an essentially free, unconstrained and informed choice or whether the accused's capacity for self-determination was critically impaired." Id. at 573, 325 P.3d 802. The court "must inquire into the totality of the circumstances surrounding the police interrogations to determine whether the defendant in fact knowingly and voluntarily *475 decided" to forgo his right to remain silent. State v. Anderson , 175 Or. App. 464, 473, 28 P.3d 662 (2001) (citation and internal alterations omitted). When we review a trial court's voluntariness determination, we "accept the court's findings of fact if there is any evidence *133 to support them." Ruiz-Piza , 262 Or. App. at 564, 325 P.3d 802. If the court did not make findings on all necessary facts, and there is evidence from which the facts could be decided more than one way, "we will presume that the facts were decided in a manner consistent with the ultimate conclusion, e.g. , voluntariness or lack thereof, made by the trial court." Id. (citation and internal alterations omitted).
In this case, the trial court declined to rule on the voluntariness of defendant's statements after the alleged invocation and did not make any factual findings on that issue. In similar situations, we have not decided voluntariness on appeal but instead remanded for the trial court to do so. In Anderson , the defendant had made statements to the police that he later sought to have suppressed on the bases that he had invoked his right to remain silent and that his statements were involuntary. 175 Or. App. at 468, 28 P.3d 662. The trial court suppressed the statements based on invocation and did not reach involuntariness. Id. at 474, 28 P.3d 662. We reversed on invocation. As to involuntariness, we rejected the state's request that we rule on that issue ourselves, explaining that the trial court had not made the necessary factual findings and that it was "entitled to determine in the first instance whether defendant waived his right to silence and whether his statements were voluntary." Id. at 475, 28 P.3d 662. We "remand[ed] for findings of fact on those issues." Id. Similarly, in State v. Onuskanich , 86 Or. App. 454, 460, 739 P.2d 1062 (1987), we reversed a suppression ruling and remanded for findings of fact on the alternative basis of involuntariness because "the court made no relevant findings."
So too here we remand for the trial court to determine whether defendant's statements after 2:05 p.m. in the third interview were voluntary, including making any necessary factual findings.
CONCLUSION
In sum, the officers did not violate defendant's right to remain silent under Article I, section 12, of the Oregon Constitution when they continued the interview after defendant said, "I'm tired of these interviews. I want to be with my family." In the context in which it was said, that statement *134 was not an invocation of the right to remain silent. Moreover, defendant's next statement, requesting to proceed with a polygraph, clarified any possible ambiguity. The trial court therefore erred in granting defendant's motion to suppress based on his right to remain silent. As for voluntariness, we remand for the trial court to determine in the first instance whether defendant's statements on September 30, after he said that he was "tired of these interviews" and "want[ed] to be with [his] family," were voluntary.
Reversed and remanded.

During the interview, defendant admitted to accidentally dropping G at one point, but that incident appears unrelated to the injuries that led to the current charges.

Defendant was arrested 7.5 hours after the interview began. At the suppression hearing, the parties and the court referred to the interview as having lasted 3.5 hours. The entire video is not in the appellate record, but defendant has suggested that 3.5 hours was the total interrogation time, less breaks and polygraphs.

On appeal, the parties primarily address the issue of equivocal invocation, because of the trial court's ruling. But defendant does assert at times that his statement was an unequivocal invocation. We reject that argument without further discussion and limit our written opinion to the issue of equivocal invocation.

The phrase "cut off questioning" originates from Miranda v. Arizona , 384 U.S. 436, 474, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ("Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.").

The trial court did not make any findings about the video, and defendant has not identified anything in the video that would support a finding in support of invocation, except for a pause between defendant's statements that we address in footnote 6. See 295 Or. App. at 131 n. 6, 433 P.3d at 473 n. 6.

We disagree with defendant that the short pause between his alleged invocation and his clarifying statement was constitutionally significant. Not only did the officers not ask any questions during the pause, but the trial court suggested that Sigler did not have time to ask a clarifying question until after defendant made his own clarifying statement. (The court twice indicated that Sigler should have asked a clarifying question "after" defendant said, "And bring in a lie detector test.") We do not mean to suggest that a pause could never be significant. However, when a suspect says something, an officer is allowed a moment to think about what was said and to decide what to say next-which might include formulating a clarifying question. The pause here was brief (about five seconds), and defendant resumed talking immediately after Sigler said "okay."